[No. 11719. In Bank. — November 30, 1889.]

WILLIAM KOHL ET AL., RESPONDENTS, *v.* P. M. LILIENTHAL ET AL., APPELLANTS.

CORPORATION — TRANSFER TO NEW CORPORATION — DISTRIBUTION OF CAP-
   ITAL STOCK. — When a mining corporation, organized and existing under
   the laws of this state, transfers its mining ground to a new corporation,
   in consideration of stock to be issued by such new corporation, but still
   retains title to a mill for the reduction of ores, and carries on corporate
   business without attempting or proposing to disincorporate, the stock in
   the new corporation must be considered as part of the capital stock of
   the first corporation, with which it is to carry on business, and cannot
   be distributed among the stockholders thereof until the first corporation
   ceases to exist, either at the expiration of the term of its corporate exist-
   ence, or upon its dissolution by consent of the holders of two thirds of
   its shares, and upon the judgment of a court of competent jurisdiction.
   (McFARLAND, J., and THORNTON, J., dissenting.)
ID. — RIGHTS OF STOCKHOLDERS. — Stockholders have no legal title to the
   property of the corporation. That remains in the corporation, and the
   shares simply represent the right of the share-holders to share in the
   distribution of the profits of the corporation, and in the final distribution
   of its estate when it shall cease to exist and its estate shall have been
   finally administered. In advance of such final distribution, the stock-
   holders cannot even unanimously agree to a distribution or division of
   any part of the capital stock of the corporation which the directors are
   forbidden to make. (McFARLAND, J., and THORNTON, J., dissenting.)
ID. — EVIDENCE — DISTRIBUTION OF CAPITAL STOCK BY FOREIGN CORPORA-
   TION. — The distribution of stock in a new corporation among the
   stockholders of a foreign mining corporation, which conveyed its mining
   claims to such new corporation in order to effect a consolidation thereof
   with the mining claims of a California corporation, which also conveyed
   its claims to such new corporation, is not admissible in evidence upon
   the question of the right of the stockholders of the California corporation
   to a distribution of stock in such new corporation received in lieu of its
   mining claims.
ID. — DISSOLUTION OF CORPORATION — DISTRIBUTION OF CAPITAL STOCK. —
   The method prescribed by the code for the dissolution of a corporation
   is exclusive, and there can be no distribution of its capital stock under
   any other circumstances.

APPEAL from a judgment of the Superior Court of the
city and county of San Francisco, and from an order
denying a new trial.

The facts are stated in the opinion of the court.

*Mesick & Maxwell, Garber, Thornton & Bishop,* and *F. A. Berlin,* for Appellants.

*William H. Pierson,* and *Stewart & Herrin,* for Respondents.

Fox, J.—In 1882 two mining corporations—the Head Center Consolidated Mining Company, organized under the laws of California, and the Tranquility Mining Company, organized under the laws of New Jersey, were in possession of adjoining mining claims in the Tombstone mining district in the territory of Arizona. Litigation of a vexatious character had arisen between them, and for the purpose of discontinuing the strife and of promoting the mutual interests of both companies, negotiations were entered into with a view to effecting a consolidation of the interests and properties of the two. Being organized under the laws of different states, they were advised that this could not be done by a consolidation of companies, as provided by the laws of California. After considerable negotiation on the subject, it was decided to organize a third company, to be known as the Head Center and Tranquility Mining Company, with a nominal capital stock, consisting of two hundred thousand shares, and to which each of the old companies should transfer its mining ground, each in consideration of five dollars and of one hundred thousand shares of the stock of the new company.

This new company was incorporated on the 1st of December, 1882, and a board of seven directors selected, three to represent the interests of the stockholders of each of the old companies, and a seventh who was impartial between them.

To this new company when organized a proposition was formally made to convey the grounds known as the Head Center and Yellow Jacket claims (they being of the property of the Head Center Consolidated Mining Company) to it, in consideration of the sum of five dol-

lars and of one hundred thousand shares of the stock of the company, and a like proposition on the part of the Tranquility Mining Company, to convey to it the Tranquility mining claim, with its appurtenances, for a like consideration, and both propositions were accepted, by resolution of the board of directors, unanimously passed. On the 4th of January, 1883, at a meeting of its board of directors, the Head Center Consolidated Company passed the necessary resolutions authorizing its president and secretary to make the necessary conveyances to carry out this proposition, and on the 25th of the same month, at the annual meeting of the stockholders of the same company, at which 160,165 shares of the 164,211 outstanding shares of the stock of the company were represented, this action of the directors was ratified, and on the 27th of February following a deed was executed accordingly.

On that day Mr. Benjamin, to whom the secretary of the new company had been directed to issue the 100,000 shares of stock in the new company for the Head Center Company, directed the secretary to issue 99,980 shares of the stock to him as trustee, and the remaining portion of it in pieces of five shares each to several of the directors; and Jewell, to whom it had been ordered that the 100,000 shares paid for the property of the Tranquility Company should be issued, directed that 99,975 shares of it be issued to Mr. Kohl as trustee, and the rest to the remainder of the directors, which was done.

The stock thus issued was deposited in the Anglo-California Bank, to be held subject to the joint order of Kohl and Foster. Although the question of what disposition was finally made of that part of it which was issued in payment for the property of the Tranquility Company is not involved in the issues of this cause, it is claimed that it was distributed to the shareholders of the original Tranquility Company in proportion to their respective number of shares of Tranquility stock, and

that no question was ever made as to the right to make such distribution; and this fact is urged upon us as strongly persuasive of the correctness of the claim of these plaintiffs, to have that part of the stock of the new company which was issued in payment for the property of the Head Center Company distributed among its stockholders, in proportion to the number of shares held by them respectively in said last-named company. But we fail to see the force of that argument, or how evidence of what the stockholders of a New Jersey corporation may have done, or agreed to do, was in any manner relevant or material in this action. The laws of New Jersey may permit such a distribution of the assets which form the capital stock of a corporation organized under its laws. But whether they do or not, the action of the stockholders of a New Jersey corporation, in the matter of the distribution of the assets of their own company, cannot change the laws of California, and for this reason, as well as because there was no contract between the two companies on the subject of the disposition which should be made of the stock of the new company when received, nor any reason why there should be such a contract, the admission of evidence upon that subject (as to what the Tranquility people did with their stock) was error, manifestly prejudicial to the defendants in this cause.

The mining ground of the Head Center Consolidated Mining Company so conveyed to the Head Center and Tranquility Company did not comprise all the property of the former company. It had and still has left a mill for the reduction of ores, and is still carrying on corporate business and reducing ores, a part of the time at least at said mill, and keeps a general agent and superintendent in Arizona to look after its affairs. It was not free from debt at the time it sold this property, but some six months afterward levied and collected an assessment and paid up its then existing indebtedness. Its term of corporate existence has not expired, and it has

not attempted to, and does not propose to, disincorporate.

Under these circumstances, the plaintiffs, Kohl, Moody, and Rehfisch, bring suit against the defendants, the Head Center Consolidated Mining Company, and certain of its officers, alleging that they, the plaintiffs, are the owners and holders of 63,138 shares of the capital stock of the Head Center Consolidated Company, and as such, and by reason thereof, are entitled to have and receive to their own use 39,115 shares out of the 100,000 shares of the capital stock of the Head Center and Tranquility Mining Company so received for the sale of the property of the Head Center Consolidated Company, and pray a decree compelling the defendants to transfer, issue, and deliver the same to them, and restraining the defendants from representing, voting, or dealing in any way with the shares so claimed by plaintiffs. The defendants claim that these shares are the property and assets of the Head Center Consolidated Company; that the company has no right under the law to distribute them to its stockholders, and that its directors are entitled to represent and vote them at all meetings of the Head Center and Tranquility Company.

The plaintiffs had judgment in the court below, and from this and an order denying a motion for new trial, the defendants appeal. The grounds of the appeal, briefly stated, are that the judgment is unsupported by the findings, and any admissions in the pleadings, and that the findings are unsupported by the evidence.

We have already substantially stated most of the facts as found by the court or admitted by the pleadings, so far as they are necessary to this opinion. There is, however, one other fact found by the court, necessary to the support of its judgment, if under the law it could be supported at all, but which finding we do not think is supported by the evidence. That finding is, that it was "mutually understood and agreed by and between

the stockholders of both the old companies, that the stock of the new company should be equally divided between and belong to the *stockholders* of the old companies." We are unable to find competent or satisfactory evidence of any such agreement,—especially of such an agreement among the stockholders of the company defendant here, or between any portion of such stockholders. There is plenty of loose and vague talk of an "*understanding*" of that kind, and we have no doubt that some of the stockholders did *suppose*, and in some sense *understood*, that there would be such a distribution of the stock as plaintiffs are here seeking to enforce. But this is an understanding which each of the stockholders who had it at all had with himself, or with such others, part only of the whole, as happened to share it. It was not the basis of any treaty or agreement among the stockholders, or between them and the directors. But suppose there had been such an agreement among even a large majority of the stockholders, it would have been an agreement to change the terms of an existing contract which the statute had made between the whole body of stockholders, and would not have bound the non-concurring minority. If but a single stockholder, owning but a single share of the stock, had objected, the directors would have been bound to regard his protest. There is no pretense that all of the stockholders of this corporation consented to the distribution of this stock. Over four thousand shares of the stock outstanding were unrepresented at the meeting which ratified the consolidation; a large amount of the stock was represented by proxy, and the proposition to distribute did not, and could not, come before the meeting. The "understanding" that there was to be a distribution must be referred to some other occasion. The witnesses who testify to it leave it in the clouds. Only a minority of the stock —scarcely a third—is represented by the plaintiffs in this action, and the holders of a very large proportion of

the stock positively deny that any understanding or agreement to distribute the stock of the consolidated company ever existed.

But it would make no difference if the fact were otherwise. Even if a small minority of the stockholders have not consented, this court should not command the directors to do what by the plain language of the statute they are forbidden to do.

Nor is there any force in the suggestion that the minority (if it be a minority) are not here objecting. Naturally they are not here objecting in their own names because they have not been made parties to this action. But they are represented here by the directors, who, as in duty bound, are urging the objection in their behalf. Manifestly, the interests of all the absent stockholders are involved in the litigation, and unless the directors are to be heard upon this ground, it results that the rights of the stockholders are to be adjudicated without a hearing.

The statute (Civ. Code, sec. 309) which controls the directors, and by which we are also bound in this case, reads as follows:—

"The directors of corporations must not make dividends, except from the surplus profits arising from the business thereof; *nor must they divide, withdraw, or pay to the stockholders, or any of them, any part of the capital stock;* nor must they create debts beyond their subscribed capital stock, or reduce or increase the capital stock, except as hereinafter specially provided. For a violation of the provisions of this section, the directors under whose administration the same may have happened (except those who may have caused their dissent therefrom to be entered at large on the minutes of the directors at the time, or were not present when the same did happen) are in their individual and private capacity jointly and severally liable to the corporation, and to the creditors thereof, in the event of its dissolution, to the full amount of the

capital stock so divided, withdrawn, paid out, or reduced, or debt contracted; and no statute of limations is a bar to any suit against such directors for any sums for which they are made liable by this section.   There may, however, be a division and distribution of the capital stock of any corporation which remains after the payment of all its debts *upon its dissolution, or the expiration of its term of existence."*   (The Italics are our own.)

The term "capital stock," as used in this section, has a very different meaning from that of "shares of the capital stock," as representing the interest which the holders thereof have in the business and property of the corporation whose shares they hold.   "Capital stock," as used in this section, is frequently otherwise and as well expressed by the simple word "capital," and means the money and property with which the company carries on its corporate business.   (*Martin* v. *Zellerbach,* 38 Cal. 309; 99 Am. Dec. 365.)   It is vested in the corporation as a sacred trust for the protection of its creditors.   (*Martin* v. *Zellerbach,* 38 Cal. 309; 99 Am. Dec. 365; *San F. & N. P. R. R. Co.* v. *Bee,* 48 Cal. 398.) This money and property of the corporation constitutes the actual capital of the company, to which all persons having dealings with the corporation, by means whereof they may become its creditors or become personally liable for its debts (as shareholders do become, under the of laws this state, for their proportionate share of all its debts created while they are stockholders), look, and have a right to look, to determine the measure of the company's responsibility and of their security.   The bare fact that a man holds "shares in the capital stock" of a corporation gives him no legal title to the property of the corporation.   That remains in the corporation, and not in the shareholders.   (*Gorham* v. *Gilson,* 28 Cal. 484; *Gashwiler* v. *Willis,* 33 Cal. 19; 91 Am. Dec. 607; *Miners' Ditch Co.* v. *Zellerbach,* 37 Cal. 591; 99 Am. Dec. 30; *Wright* v. *Oroville G. S. & C. M. Co.,* 40 Cal. 20; *Clark*

v. *San Francisco*, 53 Cal. 311; *Johnson* v. *Kirby*, 65 Cal.
433; *McCormick* v. *Springfield F. & M. I. Co.*, 66 Cal. 363.)
The shares simply represent the proportion to which the
respective shareholders, who may be such at the date of
distribution, are severally entitled in the distribution of
*profits* arising from the corporate business, which may
be made from time to time, and in the final distribution
of the estate of the corporation, when from any cause it
shall cease to exist, and its estate shall have been fully
administered. This event may happen at the expiration
of the term of its corporate existence, or it may be ac-
complished earlier with the consent of the holders of
two thirds of its shares, and upon the judgment of a
court of competent jurisdiction. (Code Civ. Proc., secs.
1227–1233.)

But this event has not happened in this case. The
Head Center Company has sold its mine to a new cor-
poration for one hundred thousand shares of the stock
of such new corporation; but it has not ceased to exist
as a corporation, and does not propose to do so. It re-
mains a corporation, with full corporate power and ca-
pacity, and is also exercising those powers. The mine
which is sold constituted the bulk of its capital, or "cap-
ital stock." The stock which it received in exchange
for its mine stands in the place and stead of the mine,
precisely the same as if it had been money or any other
kind of property instead of stock; and by the plain terms
of the section of the code cited, the directors are forbid-
den to divide it among the stockholders. But it is said
that this section operates only to restrain the directors,
and does not prevent the stockholders from doing by
agreement what the directors are forbidden to do. As
already shown, we do not think the evidence proves any
such agreement by the stockholders; but if it did, we
hold that even the unanimous assent or agreement of
the stockholders would not authorize such a distribu-
tion. The inhibition runs against the directors because

they are, under the law, the managers of the business of the corporation. What the directors cannot do (with few exceptions, of which this is not one) the stockholders cannot do, or authorize to be done. The inhibition of the statute has regard not only to the rights of existing creditors, but to those of all persons who may deal with the corporation on the faith that its capital has not been divided. Certainly the effect and operation of the statute, if unrepealed by judicial construction, would be to afford a large measure of protection to future as well as existing stockholders and creditors; and having that effect, it ought to be supposed that such was its purpose. It cannot be assumed that the legislature intended that corporations who have divided up among their stockholders the capital stock with which they were doing business should continue to maintain a corporate existence, with power to contract, incur debts, and perpetrate the numberless frauds that would, under such circumstances, be within their power. A contrary intention is clearly implied in the express provisions of the Code of Civil Procedure relating to the dissolution of corporations (sections 1227 to 1233), and of the Civil Code above quoted, allowing distribution of their remaining capital after payment of their debts, upon dissolution or expiration of their term of existence.

When a method of procedure is prescribed by which a corporation may be dissolved, that method must be followed. When it is provided that the application must be made to the superior court, and must be in writing, verified, and must show "that at a meeting of the stockholders, *called for that purpose*, the dissolution of the corporation was resolved upon by a two-thirds vote of all the stockholders, and that all claims and demands against the corporation have been satisfied and discharged," there will be none so bold as to contend that a voluntary dissolution of a corporation can be effected without compliance with these requirements; and it is

equally certain that when the legislature has said, in the same section of the code in which it has forbidden the directors to divide the capital stock of a corporation among the stockholders, that the remaining capital may be distributed, after the payment of all its debts, *upon its dissolution or the expiration of its term of existence,* the intention was that there should not be a distribution under any other circumstances.

And why, it may be pertinently asked, should any court go out of its way to order a distribution in any other mode or under any other circumstances than the statute prescribes? If the debts of the Head Center Company are paid, and two thirds of its stockholders desire a distribution, nothing could be easier than to accomplish everything that is sought in this action by simply pursuing the statute. Why, when there is a plain and speedy statutory remedy, should this extraordinary remedy be allowed? The only answer to this question must be that the parties desiring this distribution cannot comply with the statute,—that two thirds of the company do not desire to dissolve and distribute the capital; therefore this court is called upon to order a distribution without dissolution, and to sanction the continued existence of a corporation with little or no capital,—in other words, to do what the statute has never authorized the court to do and has forbidden the directors to do. And this, too, when to do it we must establish a precedent under which less than two thirds of the stockholders of a corporation may at any time compel a distribution of the whole or any part of its capital, upon the most loose, vague, and unsatisfactory oral testimony that there was an "understanding" among the stockholders that it should be divided. In other words, stockholders who have heretofore imagined that in entering a corporation they were becoming parties to a contract, the terms of which were written in the statutes of the state, are to be informed that the contract may

be changed and their rights impaired by an "under-standing" among an indefinite number of their fellow-stockholders. A wide door would thus be thrown open to frauds, and contract rights would be taken away from contracting parties without their consent.

The statute upon this subject is too plain to admit of a doubt or to leave room for construction. It was so held and adjudged by this court more than twenty years ago in a well-considered and able opinion, which has ever since been accepted as established law, under which rights in property have accrued to an untold amount, which ought not now to be disturbed. Upon the faith of this statute, as it was found in almost identical terms with the present section 309 of the Civil Code, in section 13 of the corporation act of 1853, and of the decision referred to (*Martin* v. *Zellerbach, supra*), thousands of people, and no doubt among them these plaintiffs, have assumed the liabilities of shareholders in corporations, which possibly they would not have assumed had they not been thus assured of the protection resulting from keeping the capital of the corporation intact until its final dissolution.

The only difference between that case and this was that there the two corporations uniting to form the third were both domestic corporations, and the consideration for the transfer of the property to the new corporation was not by "understanding," but by actual agreement of both corporations, and of all the share-holders of each, that the stock of the new corporation should be issued and delivered directly to the share-holders of the old ones, in proportion to the number of shares which they respectively held in the old. The court held, in the most emphatic terms, that the language of the statute left no room for construction or doubtful interpretation, and that this agreement for the distribution of the shares of the stock of the new corporation, received for the transfer of the property of the old companies,

was in direct violation of the statute; that these shares must remain the property of the old companies, in lieu of the property for which they had been received, and as constituting the capital of the old companies, not to be distributed until their dissolution and the payment of their debts.

This has been the written law of this state for more than thirty-five years. Under it all our corporations have come into existence, and their stock has been distributed among its people. It has constituted one of the bulwarks of corporate stability, and one of the chief securities of persons dealing with corporations, either as creditors or share-holders. The legislature has not changed it by enactment; the court cannot do it by interpretation.

Judgment and order reversed.

Beatty, C. J., Works, J., Paterson, J., and Sharpstein, J., concurred.

McFarland, J., dissenting.—I dissent. The simple project of the two corporations, having adjoining mining claims, consolidating by each conveying to a new corporation created for that express purpose, and the persons who held the stock of the two old ones taking their proportionate shares of stock in the new one, there being no creditors, does not seem to me to be at all within the provisions of section 309 of the Civil Code, against directors *making dividends or paying capital stock* to stockholders. I cannot conceive how, in the case at bar, the new corporation is to do any business or maintain its existence; for, according to the theory of the appellent, the new corporation has only two and can only have two stockholders, each of which is itself a corporation. It would be better to have the whole attempt at consolidation void for impossibility.

Thornton, J., dissenting.—I dissent. I am of opinion that there was evidence sufficient to sustain the finding

of the court that it was agreed among the stockholders that one hundred thousand shares of stock in the new corporation should be divided among the stockholders in the Head Center Consolidated Mining Company as they held shares in the Head Center Company.

I adopt the opinion of the commissioners formerly rendered in this case as a correct exposition of the law applicable to it.

The following is the opinion of Department Two, rendered on the 18th of February, 1889, referred to and adopted by Mr. Justice Thornton in his preceding dissenting opinion:—

FOOTE, C.—The plaintiffs claim to be the owners and holders of 63,138 shares of the stock of the Head Center Consolidated Mining corporation, and bring this action to compel the defendants to transfer, deliver, and issue to them 39,115 shares of stock of the Head Center and Tranquility Mining Company, and to restrain the defendants from representing, voting, or dealing in any way with these latter shares of stock, of which plaintiffs claim to be the owners.

The plaintiffs claim to derive their title to the last mentioned by reason of their ownership of the first mentioned shares of stock.

The plaintiffs had judgment, and from that and an order denying a new trial, the defendants have appealed. The grounds of the appeal, concisely stated, are that the judgment is unsupported by the findings and any admissions in the pleadings, and that the findings are unsupported by the evidence.

According to the evidence in the record, some time in the summer of the year 1882, two mining companies were in possession of adjoining mining claims in the Tombstone district of the territory of Arizona. One of them, called the Tranquility Mining Company, was incorporated under the laws of New Jersey; the other,

the Head Center Consolidated Mining Company, was a California corporation.

Litigation of a vexatious character had sprung up between these two companies. For the purpose of discontinuing this strife, and furthering their mutual interests, an arrangement was proposed to be effected upon the part of the stockholders of both companies, by common consent, by which the formation of a new corporation was to be had, to which should be deeded all the property of both the old companies, in consideration of the stock of the new company.

After various negotiations looking to this end, the Head Center and Tranquility Mining Company was organized on the first day of December, A. D. 1882, its capital stock being fixed at two million dollars, and the number of shares at two hundred thousand. This step was taken upon legal advice that it was the most feasible method by which the two companies could be consolidated, one being a New Jersey corporation, and not subject to the provisions of the Civil Code of California with reference to the consolidation of such corporations. The subscribers to the stock of the new company, and who constituted the board of directors thereof, were F. A. Benjamin, T. E. Jewell, A. W. Foster, William Kohl, P. N. Lilienthal, J. N. Gitchell, and J. W. Pew, who each nominally subscribed for five shares of stock. It seems to have been agreed upon all sides by the stockholders of the two original companies that an equal voice in the management of the new company should be accorded to each set of stockholders.

At the first two elections of directors three of them were selected to represent the stockholders of each of the old companies respectively, and a seventh person was elected as being impartial. On the 18th of December, 1882, the board of directors of the new company unanimously adopted a resolution to the effect that the proposition of Messrs. Jewell and Benjamin to sell, convey,

or cause to be conveyed to that company the mining claims and grounds known as the Head Center and Yellow Jacket claims in the Tombstone mining district of Cochise County, Arizona, in full payment and satisfaction of the sum of five dollars, and one hundred thousand shares of the capital stock of that corporation, and the Tranquility mining claim of the same district, county, and territory, with its appurtenances, for the like sum of money and the like number of shares of the capital stock aforesaid, should be accepted. The president and secretary of that corporation being thereby directed to transfer, on the basis proposed, the two hundred thousand shares of its consolidated stock to Benjamin and Jewell, or their order, on the books of the corporation, on the reception by the company of the conveyance of the property of the two old corporations.

Afterward, on the 4th of January, 1883, the directors of the Head Center Consolidated Company passed certain resolutions, with a view to carry out the arrangement above mentioned.

These resolutions recognize the existing *status* of affairs as heretofore mentioned, and for the purpose of carrying out the compromise and consolidation which had been agreed upon, direct the president and secretary of the corporation to execute a conveyance of its mining ground, and to receive in consideration therefor five dollars in money and one hundred thousand shares of the capital stock of the new corporation.

On the 25th of the same month, at an annual meeting of the stockholders of the Head Center Consolidated Company, at which 160,165 shares of the 164,211 outstanding shares of the stock of the company were represented, the action of the directors in the matter of the consolidation was ratified, and on the 27th of February following the deed was executed by the officers of that corporation.

On that day, also, Mr. Benjamin, to whom the secre-

tary of the new company had been directed to issue the 100,000 shares of stock in the new corporation for the Head Center property, directed Mr. Pew, who was that secretary, to issue 99,980 shares of the stock to himself (Pew) as trustee, and the remaining porton of it in pieces of five shares each to several of the directors; and Jewell, to whom it had been ordered that the 100,000 shares of the stock of the Tranquility property was to be issued, directed that 99,975 shares of it be issued to William Kohl, as trustee, and the rest to the remainder of the directors, which was done.

The stock thus issued was deposited in the Anglo-Californian Bank, to be held subject to the joint order of Kohl and Foster, under a stock-pooling arrangement, to which the stockholders of both the original companies were parties.

There does not seem to have been any question as to the right of distribution among the stockholders of the old Tranquility Company of their *pro rata* share of the new stock, but when Mr. Kohl, the trustee for the Head Center stockholders, demanded that their stock be distributed to them in like manner, the request was refused, on the ground that the law did not authorize such a distribution, as it vested the title and right to the stock in the old corporation, as its capital stock, by reason of the fact that the stock was a mere substitution for the mining ground which had belonged to that company, and it was not legal that the capital stock of the corporation should be divided out among the stockholders.

And here, in passing, it may be remarked that no objection seems to have been made in any quarter to such a dividing out *pro rata* to the stockholders of the Tranquility Company of the shares of stock which fell under the new arrangement to the Tranquility in lieu of its mining ground, etc. And it also appears that no difference existed under the arrangement for consolidation, in the agreement and understanding, as it affected

the Tranquility or the Head Center Consolidated Company and their several stockholders. If this arrangement was, without any objection, carried out as to the one, that would seem to be a strong circumstance going to show that the same understanding must have existed on the part of the stockholders and all parties concerned, with reference to what was to be done with the stock of the other old company.

Upon the other hand, the defendants claim that the oral testimony establishes no such common understanding, and that it and the documentary proof indicates very clearly that the real transaction was merely a sale of its property by the Head Center Consolidated Mining Company, in consideration of one hundred thousand shares of the capital stock of the Head Center and Tranquility Company (the new company); that the transaction as carried out was a corporate transaction, rather than one on the part of the body of the stockholders of the Head Center Company.

But the evidence indicates that when the stock was issued it was not to the corporations, but to Kohl and Pew, trustees, and was to remain in a pool for a certain purpose, for a certain specified time, when it was to be divided out among the stockholders, in pursuance of the original plan and agreement.

This is abundantly shown, to quote from the opinion of the judge below, who heard the witnesses testify, and saw them face to face, by "the positive testimony of the plaintiffs, the negative corroboration of that testimony by defendants, borne out by the recorded acts of all parties." All of which makes it plain "that the arrangement, as planned and executed, was a consolidation of the interests of the two sets of old stockholders in the new Head Center and Tranquility companies." This conclusion is consistent with all the testimony, oral and written, and is in perfect harmony with the conduct of all parties, which is convincing evidence of "its correct-

ness, especially in view of the further circumstances that what is claimed to have been agreed on is just what would have been the best thing for all interests to have been done, if the old corporations had both been domestic or state corporations.

If then, as we conclude it to have been, the arrangement was "the act of the body of the Head Center stockholders," and the stock was issued to Pew as their trustee merely, is the transaction one forbidden by section 309 of the Civil Code, or by the general principles of equity which govern such transactions?

If the consummation of the agreement would result in fraud of complaining creditors' rights, or was opposed to the interests of the stockholders, it is plain that under the decision of the appellate court in *Martin* v. *Zellerbach*, 38 Cal. 300, in giving construction to a similar statute, such a division of stock among stockholders would be unlawful. But, as appears to us, this arrangement was for the benefit and interest of all parties, both the creditors to whom not a large sum was due, which was paid before this application to divide the stock was made, and to the stockholders themselves, who thereby, as it seems to us, would have occupied relatively the same position in the new company which they held in the old. The prohibition, as we take it, contained in the section of the Civil Code, *supra*, "is directed against the trustees, and seems designed to protect creditors as such, and also to protect the stockholders against their mismanagement in distributing capital stock in the form of dividends, with a view to holding out the idea that the corporation is more prosperous than it is, for the purpose of promoting some unlawful object. *If all parties* in interest are secured from injury, and the purpose is a lawful one, the object of the provision would seem to be accomplished, and there would be no one entitled to complain. Such a transaction was regarded as lawful in

*Treadwell* v. *Salisbury Manufacturing Company*, 7 Gray, 393." (*Martin* v. *Zellerbach, supra.*)

Here the debts are all paid before the stock is asked to be delivered, the parties asking it are those who had the stock in one of the original companies, whose property is now owned by the new company, and they do not ask for anything more than was agreed upon all hands that they should have, and which, as it seems to us, they ought to have. What was considered a fair thing — which no one seems to doubt — for the Tranquility stockholders should not be unfair to the Head Center stockholders, who have contributed their all in the way of property to the new corporation. Section 309, *supra*, in our judgment, does not inhibit a body of stockholders from "doing for a lawful purpose, and without injury to creditors," that which appears in this instance to have been for the best interests of all concerned.

As throwing some light upon this proposition, the appellate court, in the case of *Chater* v. *San Francisco Sugar Refinery Co.*, 19 Cal. 220, may be referred to as having asserted that stockholders have a right to preserve their just rights of property in consonance with contracts which they may have made, notwithstanding the intervention of corporate agencies, which claim the property for themselves. In *Short* v. *Beaudry*, 56 Cal. 450, after quoting from the case *supra*, the court says: "The truth is, the corporation, under our system, following such an agreement [as the one here shown], would be the mere agency of the associates, created for the sake of convenience in carrying out the agreement, *as between those who made the bargain*, the different characters or forms in which or by which the bargain was made, and the order in which the several parts of it were executed, making no substantial difference in the obligation." The appellate court further said: "Substantial justice can be administered in this case by treating the parties in the light of their agreements be-

tween themselves, independently of their incorporation, and in no other way that we can discover can this be done."

So in the present instance the court below seems to have done substantial justice as between all the parties to the transactions which resulted in the incorporation of the new mining company; and perceiving no judicial error in the record, we advise that the judgment and order be affirmed.

BELCHER, C. C., and HAYNE, C., concurred.

The COURT.—For the reasons given in the foregoing opinion, the judgment and order are affirmed.