NIGHTINGALE v. MILWAUKEE FURNITURE CO. et al.

(Circuit Court, S. D. California. December 23, 1895.)

No. 284.

1. CORPORATION—CHANGE INTO PARTNERSHIP.

A corporation formed according to the state law, and duly set going as such, cannot be changed into a copartnership by a court of equity, at the suit of one of the incorporators, merely because the books were kept by him as if the concern was a copartnership.

2. SAME.

Nor is the character of the concern changed by the fact that the stockholders in a paper guarantying a debt of the company spoke of it as a "firm."

3. SUIT FOR ACCOUNTING—FRAUD OF COMPLAINANT.

The general manager of the business of a corporation, who, though an expert bookkeeper, has kept the books so that the true state of accounts cannot be ascertained therefrom, and who has been guilty of appropriating funds of the corporation to his own use without accounting therefor, cannot maintain a bill for an accounting by the corporation, or by the members thereof considered as partners, for money advanced by him for the use of the corporation.

Bill by Newell Nightingale against Milwaukee Furniture Company, and others.    Bill dismissed.

Edward S. Bragg and Stephen M. White, for complainant.
Waldo M. York and A. W. Hutton, for defendants.

ROSS, Circuit Judge.    The transactions which culminated in the present suit had their beginning in the spring of 1888.    A certain furniture business had been established and carried on in the city of Los Angeles by the firm of Bryant, Arnold & Jones, afterwards by Bryant & Arnold, and then by Otis P. Arnold alone.    On the 2d day of March, 1888, Otis P. Arnold, L. J. P. Morrill, George L. Arnold, and John Jucker, who are made defendants to the bill, together with the complainant and certain other persons, namely, Seth C. Arnold, William Zinns, and A. C. Blankenburg, for the purpose of forming a corporation under the laws of California to carry on at the city of Los Angeles a general furniture business, prepared and signed articles of association for the purpose, and filed them in the office of the county clerk of Los Angeles county, Cal., and on the 5th day of March, 1888, filed a certified copy thereof in the office of the secretary of state of California, such articles stating, in substance, the term and life of the corporation to be 50 years, and the business in which it proposed to engage to be the buying and selling of furniture; and stating its capital stock to be $100,000, divided into 1,000 shares of the par value of $100 each; and stating that 90 per cent. of such capital stock was then in fact paid in.    The persons subscribing for the stock, and whose names appeared as subscribers upon the subscription list attached to and made a part of the articles of incorporation so filed, and the number of shares taken by each, were as follows, namely:    The defendant Otis P. Arnold, 200 shares, $20,000;  the defendant L. J. P. Morrill, 200 shares, $20,000;  the complainant, Newell Nightingale, 150 shares, $15,000;  the defendant John Jucker, 50 shares, $5,000;  the defendant George L. Arnold, 50 shares, $5,000.  In addition to these, all of whom were made parties to the bill in this case, Seth C. Arnold's name appears as a subscriber for 100 shares, $10,000;  A. C. Blankenburg, 100 shares, $10,000;  and William Zinns, 50 shares, $5,000.    In and by the articles of incorporation the board of directors thereof was fixed at five, and the defendants Otis P. Arnold, L. J. P. Morrill, George L. Arnold, the complainant, Newell Nightingale, and the said A. C. Blankenburg, were named and designated as the first board of directors.    In the bill filed by the complainant he omitted to allege the fact, afterwards set up in the answer of the defendants, and established by proof, that upon the filing in the office of the secretary of state of California of a certified copy of the articles of incorporation filed with the county clerk of Los Angeles county, the secretary of state, pursuant to the statute of California, issued and delivered to the Milwaukee Furniture Company his certificate stating that a certified copy of such articles was filed in his office on the 5th day of March, A. D. 1888, containing the required statement of facts, to wit:    First, the name of the corporation;  sec-

ond, the purpose for which it is formed; third, the place where its principal business is to be transacted; fourth, the term for which it is to exist; fifth, the number of its directors or trustees, and the names and residences of those who are appointed for the first year; sixth, the amount of its capital stock, and the number of shares into which it is divided; seventh, the amount of its capital stock actually subscribed, and by whom. Although the bill alleges that the subscription for stock in the name of Seth C. Arnold was not, in fact, made by him, but in reality by Otis P. Arnold, without authority, and for the fraudulent purpose of inducing the subscription of the complainant, and that the said William Zinns was a mere dummy for Otis P. Arnold for a like fraudulent purpose on his part, and that the said Blankenburg never contributed nor intended to contribute to or take any part in the business, the evidence, I think, fails to sustain those charges in respect to those alleged frauds on the part of Otis P. Arnold, or in respect to the total failure of Blankenburg in his undertaking. It is true, as claimed on the part of the complainant, that there never was any formal meeting of the board of directors, nor the adoption of any by-laws for the corporation, nor the issuance of any stock (although certificates of stock were prepared), nor any record of the proceedings of the directors or stockholders, other than is contained in the books and accounts opened and kept under the direction and supervision of the complainant himself, which he now claims were kept between the defendants and himself as between copartners, each having individual credits for money paid in to the use of the business carried on, and debited with money drawn out. The evidence shows that, after the issuance by the secretary of state of California of the certificate of incorporation, the complainant, and Jucker, Blankenburg, Morrill, and Arnold, met and agreed that Otis P. Arnold should be president, L. J. P. Morrill vice president, and the complainant, Nightingale, should be secretary and treasurer of the corporation, and general manager of the business; and that Morrill, Nightingale, and Otis P. Arnold should each receive for their services in carrying on the business $150 per month, and Jucker, for his services in that behalf, $125 per month. The bill heads used in the business represented Otis P. Arnold as president, L. J. P. Morrill as vice president, and Newell Nightingale as secretary and treasurer; and it is in evidence that the Milwaukee Furniture Company subsequently brought certain suits as a corporation, the complaints in which were verified by the present complainant, Newell Nightingale, as its secretary. According to the evidence, neither Seth C. Arnold nor William Zinns ever paid anything on account of their subscription for stock or otherwise. Blankenburg contributed to the company a certain lot of furniture, of the value of $2,048, which was accepted by the company as that much cash from him, but no further payment or contribution has been made by him; and the bill alleges that the complainant and the defendants Otis P. Arnold, L. J. P. Morrill, George L. Arnold, and John Jucker are the only persons associated or interested in the defendant Milwaukee Furniture Company, "whether the same shall be found to be a corporation, joint-stock association, or copartnership; and owned the whole capital in the

business under that name at Los Angeles, subject only to the rights of creditors."

Although the complainant now insists that the Milwaukee Furniture Company was and is a copartnership, and should be so treated by this court, and upon that theory seeks an accounting as between himself and his alleged copartners, the defendants to the bill, yet the allegations of his own bill are that, when the articles of incorporation were signed and filed, "he believed and supposed that the subscription for stock appearing on the list was genuine, and made in good faith; and that the parties signing and purporting to have signed were all responsible financially for the several accounts subscribed; and that the amount of the several subscriptions would be paid in in cash, except the subscriptions of the defendants Otis P. Arnold and A. C. Blankenburg, which were to be paid by the delivery of goods required in the business to be entered upon;" and which he fully believed and trusted would be delivered for use, and the organization be fully perfected, and enter upon its business as a corporation.    And that, so believing and trusting, he paid, a few days after the filing of the articles of incorporation, "at the University Bank, to George L. Arnold, defendant, who was the cashier of such bank, and to whom the financial management of the affairs of the contemplated corporation were intrusted pending the perfection of the organization of the same, the sum of $8,000 towards the fund created for floating the debts of Otis P. Arnold," which, the bill alleges, the corporation was to assume; and that, having made such payment, the complainant left Los Angeles for his home, in Wisconsin, to make preparation to remove to Los Angeles to engage in the enterprise; and that, while there, making such preparation, he was advised of a draft on him for the sum of $5,000, drawn through the University Bank, and was assured by a telegram, sent at the instance of the defendant George L. Arnold on or about March 17, 1888, that complainant was secured in the payment of the draft by a bill of sale in the hands of the defendant George L. Arnold, executed by the defendant Otis P. Arnold; that, instead of paying the draft, complainant ordered its return unaccepted, and at once returned to Los Angeles, to investigate the affair, which place he reached on or about March 28, 1888, and was there informed by the defendants L. J. P. Morrill and George L. Arnold that the defendant Otis P. Arnold was in the East, making purchases, and was soon expected to return, when everything would be satisfactorily adjusted and completed; and that a necessity had arisen to call for the additional $5,000 to meet obligations of the defendant Otis P. Arnold about maturing, and to protect the credit of the new business; and that complainant, relying upon that information, paid the additional sum of $5,000; that, the defendant Otis P. Arnold, not returning, but continuing to ship furniture from the East to Los Angeles, for the payment of freight on which sufficient funds were not provided, to meet the exigencies of the situation, and to protect himself from the loss of the $13,000 already paid, as stated, complainant paid and advanced large sums of money, amounting in the aggregate to many thousand dollars in excess of the $15,000 by him originally intended to be put in the contemplated corporation, and, by the aid and sup-

port of the defendant L. J. P. Morrill, who also advanced to relieve the situation many thousand dollars in excess of his intended investment in the corporation, and by the contribution and payment by the defendant John Jucker of a considerable sum of money over and above his intended investment in the corporation, and with the aid of credit at the University Bank, complainant and the defendants L. J. P. Morrill, John Jucker, and George L. Arnold "tided over the crisis, but were compelled to and did immediately commence business without reference to the perfection of the corporation, and to have goods for sale upon the market to raise the money as fast as possible to meet the bills of purchases as they matured"; that "the business style adopted by them was the same as that used by the defendant Otis P. Arnold as aforesaid, 'Milwaukee Furniture Company,' but the books and accounts were opened and kept between themselves as individual copartners, and not as a corporation as aforesaid."

It is very clear, I think, that it was not in the power of the complainant and the defendants Morrill, Jucker, and George L. Arnold, if, indeed, such had been their intention, to convert the corporation formed under the name of the Milwaukee Furniture Company into a copartnership. Nor could the complainant work that result by opening and keeping the books and accounts, not as corporation books should have been opened and kept, but as if it was a copartnership concern. There is no evidence that the parties ever agreed to form or conduct a copartnership, and the failure of the complainant to properly open and keep the books and accounts was his fault, for which the record affords no excuse. He was an expert bookkeeper, as he himself testifies, having an experience as such of more than 15 years in businesses of extensive character, and, although he was the secretary and treasurer of the corporation, and the general manager of the business, having the control and supervision of the books, they were so kept as if, according to the testimony of one of the experts, and as the books themselves show, they were intended to mystify, instead of make clear, the transactions; and so as to make it almost, if not quite, impossible to ascertain the true state of the accounts.

The statute under and by virtue of which the corporation was organized in terms declares that, upon the issuance by the secretary of state, over the great seal of the state, of his certificate that a copy of the articles of incorporation containing the required statement of facts has been filed in his office, "the persons signing the articles, and their associates and successors, shall be a body politic and corporate, by the name stated in the certificate, and for the term of fifty years," unless it is in the articles of incorporation otherwise stated, or in the Code otherwise specially provided. Civ. Code Cal. § 296. Of the corporation so formed, Otis P. Arnold was, at some sort of a meeting, designated as president, L. J. P. Morrill as vice president, and the complainant, Newell Nightingale, as secretary and treasurer; all of whom acted as such officers, respectively, without objection from any of the incorporators, from the time it commenced business, on the 1st day of May, 1888, until the beginning of the trouble between the parties, which occurred in May, 1890. To the corporation all of the

subscribers to its stock, except Seth C. Arnold and William Zinns, paid a part, at least, of their respective subscriptions, and some of them much more, as will afterwards be seen. A corporation so formed and set going cannot be changed into a copartnership by a court of equity at the suit of any of the incorporators. A partnership can only exist in pursuance of an express or implied agreement, to which the minds of the parties have assented. Bates, Partn. § 3; Bushnell v. Ice-Machine Co. (Ill. Sup.) 27 N. E. 596; Phillips v. Phillips, 49 Ill. 437. Certainly no such express agreement existed between the incorporators of the Milwaukee Furniture Company, and the facts and circumstances of the case negative any such implication. It is true that the books were kept as though the concern was a copartnership, but this was done by the direction and under the supervision of the complainant, who was responsible for that wrong, because it was his duty to open and keep the books correctly, and because, being an expert bookkeeper, he must have known that they were not correctly opened and kept; which cannot be affirmed of any of the other parties in interest, none of whom are shown to have been familiar with the manner in which such books should be kept.

Nor was the character of the relation existing between the parties to the suit changed by the fact that on April 23, 1890, all of them executed to the University Bank a paper in which the Milwaukee Furniture Company is alluded to as a "firm," and individually guaranteeing certain notes that had theretofore, in the course of its business, been executed by the Milwaukee Furniture Company to the bank. If, according to the agreement and understanding of the parties, the organization was, in truth, a copartnership, it needed no such instrument to make it so. The evidence shows that the University Bank was the bank with which it was understood and agreed the company should do business; and that, in the course of its business, it had become largely indebted to the bank; and that, by reason of the failure of the company to have regular meetings and to adopt by-laws, and the general careless and loose manner in which its business was transacted, the president of that bank, becoming uneasy in respect to the indebtedness due it from the company and in respect to whether some question might not arise as to the nature of the company, caused to be prepared, and asked the parties in interest to sign, the following written instrument, which they did:

"Los Angeles, Cal.

"To the University Bank of Los Angeles, Cal.: The undersigned persons constitute the Milwaukee Furniture Company, a firm doing business in Los Angeles City, California, at Nos. 338 and 340 S. Main St. The notes executed to said bank, signed by the Milwaukee Furniture Company, by Newell Nightingale, Secy. and Treas., are executed by the authority of the undersigned in the business of said company, and for our benefit, and we guaranty the payment of the same, waiving notice and protest. This applies to any renewal of said notes or any part thereof.

"Dated April 23, 1890.

"L. J. P. Morrill.
"George L. Arnold.
"Newell Nightingale.
"O. P. Arnold.
"John Jucker."

Whatever the effect of that instrument as between the individuals signing it and the University Bank, for whose benefit alone it was manifestly executed, it is clear, in view of the evidence in this case, that, as between the parties themselves, it cannot operate to convert the corporation that was organized under the laws of California into a copartnership.

The case entitled Shorb v. Beaudry, 56 Cal. 446, much relied upon by the complainant in support of his contention that the parties here should be treated as and adjudged by this court to be copartners, was very different. There the corporation that was organized by Wilson, Temple, Beaudry, Shorb, and Ledyard was a mere agency to carry out the agreements into which Wilson, Temple, and Beaudry had entered. "That the corporation was formed as a mere agency, for more conveniently carrying out the agreements between Temple, Beaudry and Wilson," said the court, "is sufficiently apparent. As a corporation it paid nothing, incurred no liability, and was not to receive any part of the proceeds of the sales of land, except for the purpose of developing and improving the property held by it. All the profits were to be distributed among the three members of the association in the proportion fixed by their contract. No certificates of stock were ever issued by the corporation, nor was it contemplated that any ever should be." Such was in no respect the purpose of the Milwaukee Furniture Company. On the contrary, it was incorporated for the purpose of carrying on a business for the benefit of its stockholders, in proportion to their respective interests in the corporation itself, intended to be evidenced by certificates of stock, although, by reason of the carelessness with which the business of the company was conducted, none were ever issued until a date and under circumstances afterwards to be alluded to. I cannot, therefore, see any valid reason for holding the parties to the bill to have been copartners. And, being incorporators of a corporation organized under and by virtue of the laws of the state of California, there is no authority in this court to dissolve the corporation, and wind up its affairs. The statute of California prescribes the method by which a corporation organized under its provisions may be dissolved, and that method, the supreme court of the state decided in Kohl v. Lilienthal, 81 Cal. 378, 20 Pac. 401, and 22 Pac. 689, is exclusive. No statute of the United States purporting to confer any such power on a court of equity has been cited, nor am I aware of any; and, in the absence of valid legislation to that effect, it is quite certain that the court has no such power. 1 Pom. Eq. Jur. p. 155, § 138; 1 Fost. Fed. Prac. p. 25, § 12.

But, conceding that the defendants should be called to account as copartners of the complainant, or the power of the court in this suit to call the corporation to account with the complainant, or, even if the complainant's bill be regarded as one by which he seeks to recover money paid out by him for and on account of the corporation, or for and on account of the defendants as his copartners, I am of the opinion, in view of the evidence, that the bill should be dismissed. As has been said, the complainant was not only the secretary and

treasurer of the corporation, but the general manager of the business. Although an expert bookkeeper, and having control and supervision of the books, he kept them so that no man, according to the evidence, can ascertain the true state of the accounts.    There was a subordinate bookkeeper, who kept, among others, the petty cash book; the general cash book being kept by the complainant himself.    For a little more than two years the business seems to have been conducted harmoniously, although not very successfully.    It commenced about the beginning of a period of business depression in Los Angeles, following the collapse of what is known as the "Boom of 1887."    The complainant and the defendant L. J. P. Morrill were the moneyed men of the company.    Otis P. Arnold, to whose business the company succeeded, paid the amount of his stock subscription in furniture; Blankenburg paid $2,048 on account of his subscription in furniture; Seth C. Arnold and William Zinns paid nothing; and George L. Arnold paid $1,000 on account of his $5,000 subscription.    The complainant and the defendants L. J. P. Morrill and John Jucker not only paid the full amount of their subscriptions in money, but complainant and the defendant Morrill advanced for and on account of the company, from time to time, large sums, to pay freight and other liabilities of the company.    No effort seems to have been made to compel Zinns or Seth C. Arnold to pay in the amount of their subscriptions, or to compel Blankenburg or George L. Arnold to pay in the balance of theirs; but Zinns, Blankenburg, and Seth C. Arnold seem to have been permitted to drop out of the company, and George L. Arnold to remain a member of it, without any additional payment than the $1,000, under some sort of an understanding among some of the others that he need not put in any more money unless he wanted to.    And so the company commenced and continued to transact the business for which it was incorporated, under the guidance of the complainant, Nightingale, who, together with the defendant Morrill, advanced from time to time, for the company, large sums of money in excess of the amounts of their respective subscriptions, for which they were given credit on the books of the company, and on which they were allowed interest.    This seems to have been done with the tacit consent of all of the parties to this suit, and with the understanding between complainant and Morrill that the amounts of their advances should be proportionately equal.

The evidence in the case leaves no room to doubt that none of the parties in interest knew much about the management of the business, or the condition of its finances, except the complainant, Nightingale. Until May, 1890, matters went smoothly, but then the trouble began. On the 9th day of that month the defendants Morrill and George L. Arnold accused the complainant of taking money from the company, and appropriating it to his own use, without the knowledge of any of the other parties in interest.    Complainant admitted the truth of the charge, but said that by returning to the treasury of the company $2,600 the advances of himself and Morrill would be proportionately equal, and, accordingly, he paid back to the company the $2,600 so taken by him, $1,600 of which were paid to the University Bank on account of the indebtedness of the company to it, and $1,000 of which

v.71f.no.2—16

was credited to the defendant Morrell on account of his advances. Not only was the University Bank supposed to be the depository of the moneys of the company, but the complainant himself had a private account with that bank, and had all along been on terms of intimacy with its cashier, the defendant George L. Arnold. In some way the latter discovered that the complainant had a large amount of money deposited with the First National Bank of Los Angeles. With this information, the defendants Morrill and George L. Arnold, on the 26th day of May, 1890, went to the complainant, and accused him of taking from the treasury of the company not only the $2,600 which he returned on the preceding 9th day of the month, but other and further large sums. A denial on the part of the complainant followed, but, when informed that his deposit in the First National Bank was known, he said that $8,000 would cover all of the money he had drawn from the company's funds. The dispute and discussion in regard to the matter resulted in the drawing by the complainant at that time of a check for $10,000 on the First National Bank of Los Angeles, in favor of the defendant George L. Arnold, and delivering it to him for the company. It is claimed on the part of the complainant that he was induced to accede to this demand upon him by reason of the distress and excitement caused by the charge, and out of consideration for his family connections, and the then precarious condition of his father. It does not seem to me that a man conscious of the rectitude of his conduct and of his innocence of the charge would have thus confessed its truth, but, rather, that he would have promptly and vigorously repelled it. But human nature is sometimes peculiar, and, if there were not so many other facts and circumstances in the case corroborative of the truth of the charge, it is possible the explanation on behalf of the complainant might be accepted. To some of those facts and circumstances brief allusion will be made, to indicate the grounds upon which the decision given rests; but it is not practicable, nor deemed necessary, to do more, in view of the very voluminous record and of the vast number of exhibits, entries, accounts, etc. Take, for example, the Dunn transaction, which was this: Dunn was desirous of purchasing of the company a lot of furniture with which to furnish a house, and to pay for it in real estate. The complainant suggested to the defendant Morrill that they take the furniture from the company at $3,250, at which price, he says, the company was allowed a fair profit, and then transfer it to Dunn for a certain lot, valued in the trade at $5,000. Complainant's testimony—which, however, is denied by that of the defendant Morrill—is to the effect that Morrill acceded to his proposition, and that, accordingly, he charged himself and Morrill for the furniture on the books of the company with $1,625 each, and took, in his own name, for the benefit of himself and Morrill, a deed from Dunn for the lot of land. But the proof developed the further fact that, in addition to the conveyance of the lot, Dunn paid to the complainant for the furniture $250 in money, all of which complainant put into his own pocket, and in his testimony says he forgot to give half of it to Morrill. Of course, the complainant had no legal or moral right thus to deal with the property of the company of which he was

manager, and I am not credulous enough to believe any such story of forgetfulness on his part, especially when it is considered in connection with numerous other facts and circumstances, sufficiently suspicious in and of themselves, but which, when combined, exclude any other rational conclusion than that the complainant, during his management and control of the business of the company, abstracted from its funds large sums of money, the exact amount of which can never be ascertained from the books and accounts that he kept. It must all of the time be borne in mind that the complainant was no novice in the matter of bookkeeping. He was an expert at the business, and knew all about it; and yet, according to his own testimony, upon the books of the company he kept no account with the bank with which it did business, to which it was largely indebted, and in whose vaults the company had, from time to time, large sums of money. Nor did he ever, at any time during the more than two years that he had the management of the business of the company, cause the bank pass book, which the bank issued and he kept, to be balanced. As has been said, the subordinate bookkeeper kept a petty cash book, in which was entered, from day to day, "University Bank," stating the number of dollars and cents. In instances too numerous to mention the pass book of that bank shows for the corresponding days that the complainant deposited to the credit of the company the exact number of cents, but a round hundred or two or more hundred dollars less than the entry in the petty cash book shows was so deposited. For example, petty cash book No. 2, which is the only one appearing in evidence, commences with November 1, 1888, and for that day there is an entry, "University Bank, 1,218.95." The pass book of the bank shows that on that day the company deposited in the bank $1,018.95,—exactly $200 less than is shown by the entry in the petty cash book. Instances of this nature are, as has been said, too numerous to be mentioned in detail. Similar instances occur in respect to payments made by the complainant for insurance, freight, etc. For example, a charge against the company for $139.90, whereas the stub of the check book and the voucher show that complainant drew the check of the company for the same item for $39.90,—exactly $100 less than he charged against the company on the cash book. It is true that the University Bank pass book shows that in a number of instances the complainant deposited in that bank to the credit of company larger sums than those shown for the corresponding days on the petty cash book as having gone to that bank. It is also true that it is claimed on the part of the complainant that the entries in the petty cash book, "University Bank," so many dollars and cents, does not mean that the amount so stated was deposited in that bank, but that they were only meant to indicate that the respective amounts were turned over by the bookkeeper, at the end of the days to which they respectively apply, to him, Nightingale, and that he then put the money into a private drawer in the safe, to which he alone had the key, and from which he would pay it out in the course of the business, and make deposits in the bank from time to time as the money was needed there. If that explanation be accepted as true, then, considering it in connection with the balance of the complainant's testi-

mony and with the books, there would be absolutely nothing in any of the books of the company to indicate how much of its money, if any, was deposited in the bank. And yet, the complainant was thoroughly well versed in bookkeeping, as he himself admits. It is asking too much of a court of justice to believe that there was no bad motive on complainant's part for such conduct of the business intrusted to him, and to accept as true any such flimsy explanation of the most flagrant violation of his duties.

All of the acts of the complainant to which reference has been made, and all of the hundreds of entries and numerous omissions of which complaint is made by the defendants, the complainant insists he could satisfactorily explain if the defendants will produce a certain private day book which he claims they abstracted at the time the trouble between the parties occurred on the 26th day of May, 1890. When, on that day, the complainant, under the charges made against him, gave to the defendant George L. Arnold the check for $10,000, the defendants at once proceeded to the company's place of business, and took exclusive possession of all of the books, papers, and other property of the company, changed the combination of the safe, took the keys to the store, commenced the taking of an inventory, and put an expert to work upon the books. The complainant insists that many of the papers and vouchers have been lost or destroyed by the defendants, and that one book in particular, which he says was a private day book, kept by himself alone, and to which the subordinate bookkeeper had no access, has been made away with by the defendants, and which, if produced, would enable him to make everything connected with his management of the business of the company clear and satisfactory. All of the defendants deny that they ever saw or heard of such a book, and I am satisfied that it never existed. In the first place, I cannot understand how there could have been any proper use for such a book. A day book was found among the books of the company, and is produced, and, when it is considered that the legitimate office of a day book is to afford a place for the entry in detail of all of the business transactions, it is difficult to understand how there could have been any proper use for any other day book than the one that was found among the books of the company and is produced. Another most significant fact is that, so far as I have been able to ascertain from the evidence, the only transactions whose history cannot be traced from the books and papers that were found and produced are the transactions relating to the receipt and disbursement of the cash of the company by the complainant. This is extremely significant. Moreover, the books of the company fail to show that any such private day book was ever bought or paid for by the company, and the complainant is unable to state where he procured it. My conclusion from the evidence is that it never existed.

The view that I take of the case renders it unnecessary to go into the transactions that occurred subsequent to the rupture between the parties, or to consider the attempt on the part of the defendants, in July, 1890, to adopt by-laws for the corporation, etc., the issuance of stock at that late day, and the compelling of the com-

plainant, under threats and intimidation, to contract for the defendants' stock, and give his promissory notes therefor. Those acts, done under duress, were very properly held invalid by the supreme court of California in a suit to enforce the contract so made, and to recover upon the notes (Morrill v. Nightingale, 93 Cal. 452, 28 Pac. 1068), and need not be further referred to. But into this court the complainant has not come with clean hands, and, being satisfied that his bill is without equity, it must be dismissed, at complainant's cost. It is so ordered.