[Civ. No. 1620. Third Appellate District.—March 5, 1917.]

CHARLES A. STEWART et al., Respondents, v. STEWART HOTEL COMPANY (a Corporation), et al., Appellants; CAROLINE B. DETWILER et al., Cross-complainants and Appellants.

STEWART ESTATE COMPANY (a Corporation), Respondent, v. STEWART HOTEL COMPANY (a Corporation), Appellant; CAROLINE B. DETWILER et al., Appellants; STEWART ESTATE COMPANY et al., Respondents.

CORPORATIONS—TRANSFER OF ASSETS FOR STOCK—AVOIDANCE OF FINANCIAL RUIN — LEGALITY OF TRANSACTION.—A corporation, to save itself from financial ruin, may, in view of section 343 of the Civil Code, permitting corporations to acquire their own stock under the assessment scheme provided by law, make a transfer of its assets in consideration of a delivery to it of its own stock, without violating

the provisions of section 309 of such code, declaring that directors of corporations shall not divide, withdraw, or pay to the stockholders any part of the capital stock.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.  George A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

William P. Hubbard, for Appellants Stewart Hotel Company, Noah W. Gray, and Charles E. Linzee.

Stratton, Kaufman & Torchiana, and W. W. Kaufman, for Appellants Caroline B. Detwiler, De Etta A. Detwiler, A. K. Detwiler, and J. R. Harrison.

Edgar C. Chapman, for Appellants J. W. Mason and Rose Mason.

Lilienthal, McKinstry & Raymond, for Appellant John G. Barker.

Brittain & Kuhl, for Respondents Charles A. Stewart, Margaret Stewart, and Stewart Estate Company.

CHIPMAN, P. J.—The transcript concerns two actions, commenced in the superior court of the city and county of San Francisco, namely, one numbered 39,900, Charles A. Stewart and Margaret Stewart *v.* Stewart Hotel Company et al.; and one numbered 39,901, Stewart Estate Company *v.* Stewart Hotel Company et al.  The actions were consolidated and tried together under stipulation that the evidence taken should apply interchangeably to each of said actions.  Both are in form the ordinary actions to quiet title—the action 39,900 to the title to a certain leasehold interest in the real estate referred to in and the subject of the action 39,901, and also certain furniture and equipment constituting what is spoken of as the hotel plant of the Hotel Stewart, situated on Geary Street, between Mason and Powell Streets, in said city.  The controversy is between plaintiffs in both actions and the defendants, the Stewart Hotel Company and certain of its stockholders.

The Stewart Hotel Company was incorporated in June, 1906, for the purpose of conducting a hotel soon after the great fire and earthquake of April, 1906. The corporation acquired certain leasehold interests in some improved lots situated at the corner of Gough and Eddy Streets, in said city. There were six incorporators, each of whom contributed five thousand dollars, which appears to have been the only cash contributions to the corporation. They were plaintiffs, Charles A. Stewart and Margaret Stewart, his sister, and defendants John W. Mason, John G. Barker, T. W. Nowlin, and A. K. Detwiler. Up to January 14, 1908, the Stewart Hotel Company had issued six thousand shares of its authorized capitalization of seven thousand five hundred shares, of the par value of ten dollars each. The buildings on these lots were reconstructed and put in condition for hotel purposes and were opened to the public under the name of Jefferson Hotel. Charles A. Stewart was president of the corporation, and both he and Margaret Stewart were at all times members of the board of directors until shortly after May 12, 1908, and jointly owned two thousand shares or one-third of the issued shares of the Stewart Hotel Company. They also owned a lot on the southerly side of Geary Street, near Powell, upon which they erected an eight-story building to be known as the "Hotel Stewart." During the progress of the construction of this building the Stewart Hotel Company entered into negotiations with the Stewarts, Charles and Margaret, for a lease of the Hotel Stewart, and, in the latter part of September, 1907, the work of installing the furniture and equipment was commenced and the hotel was opened for business the latter part of November or early in December, 1907. On January 2, 1908, a lease of the Hotel Stewart premises was entered into between the Stewarts, individually, and the Stewart Hotel Company, "for the full term of ten years from and after the first day of January, 1908," at the monthly rental of three thousand five hundred dollars, containing the usual covenants found in such leases, and requiring the lessees to furnish a surety bond in the sum of fifteen thousand dollars to secure the payment of rents and the keeping of the terms of the lease. The books of the Stewart Hotel Company showed net profits of the Jefferson Hotel as follows: In January, 1908, $1,566.56; in February, $2,991.25; in March, $1,901.37; in April,

$1,474.86. The Hotel Stewart was fitted out at an expenditure of $106,528.69, on account of which there had been paid by said company, prior to May 12, 1908, as found by the court, "only the sum of $24,328.12," and that on that date the company was indebted to various creditors about the sum of ninety thousand dollars, and, in addition thereto, two thousand dollars on a promissory note to Ella R. Ransom and $3,528.60 to the Stewarts for rent of the Hotel Stewart. It appeared that the Hotel Stewart, to the close of April, 1908, suffered operating net losses as follows: January, 1908, $5,516.45; February, $1,664.25; March, profit, $420.70; April, loss, $1,369.95. The statement of accounts payable showed an indebtedness at the end of January of $122,754.88 and at the end of April of $133,054.13.

The court made the following finding: "XIII. The court finds that on the twelfth day of May, 1908, and for two or three months prior thereto, said defendant Stewart Hotel Company owed to W. & J. Sloane Company, one of its creditors, a sum in excess of fifty thousand dollars for furniture and carpets installed in said hotel. That said W. & J. Sloane Company, together with other creditors, had been pressing said defendant Stewart Hotel Company for some months previous for payment of their debts; that said W. & J. Sloane Company had, shortly prior to the twelfth day of May, 1908, threatened that unless their indebtedness was immediately or quickly adjusted, they would institute litigation and either attach all the property of the defendant Stewart Hotel Company, or involve it in expensive and ruinous litigation. That defendant Stewart Hotel Company endeavored to raise funds to meet the obligations of said W. & J. Sloane Company, but was unable to do so. That said defendant Stewart Hotel Company endeavored to obtain terms and time from said W. & J. Sloane Company and its other creditors, but was refused any and all concessions or indulgence or additional terms or time or credit. That said defendant Stewart Hotel Company was unable to obtain financial assistance from either its stockholders or from banks in San Francisco."

There had been much discussion in the board of directors as to the financial stress under which the Hotel Stewart was being operated, and on May 2, 1908, the president called a

special meeting, at which the minutes show the following—all directors being present except Barker:

"The purpose of the meeting was announced to be for the purpose of considering and acting upon a proposition for the disposal of this company's lease of the Hotel Stewart together with the hotel plant consisting of furniture and fixtures and all personal property, as a whole.

"Charles A. Stewart and Margaret Stewart, as individuals, asked the board if the Co. would accept a proposition from them to take the Hotel Stewart off the hands of the Co. and assume all the liabilities of the Co., incurred in promoting the same, in consideration of $20,000.00 of the capital stock of the Co. held by said Chas. A. and Margaret Stewart to be turned back to the treasury of the Co.

"A general discussion of said proposition was had and the board expressed a willingness to accept such a proposition, substantially as offered, if the details could be equitably adjusted between the parties, and in order to act intelligently it was suggested that the offer be put in writing and submitted to the board.

"Adjourned.

"T. W. NOWLIN, Sec."

The minutes for May 12, 1908, show as follows:

"The board met pursuant to notice, at the office of the company, No. 848 Gough street, San Francisco, Cal., this 12th day of May, 1908, at eight o'clock p. m.   Present, Chas. A. Stewart, president; Margaret Stewart; John G. Barker; John W. Mason; T. W. Nowlin.   Mr. Noah W. Gray met with the Board.   The minutes of the last regular and adjourned and special meetings were read and duly approved. . . .

"The following proposal, in writing, was submitted to the board by Chas. A. Stewart and Margaret Stewart:

" 'San Francisco, Cal., May 12th, 1908.
" 'Board of Directors, Stewart Hotel Company.

" 'Gentlemen: The undersigned, Charles A. Stewart and Margaret Stewart hereby offer and tender to the Stewart Hotel Company the following proposition: We will take an assignment of the lease of the Hotel Stewart on Geary street near Powell and a bill of sale of all the furniture and fixtures and hotel plant therein, from the company, and in consideration therefor will transfer to the company all of the capital

stock which we own in the Stewart Hotel Company, being two thousand shares of the par value of twenty thousand dollars. We will assume and pay all the liabilities incurred and now outstanding in promoting and operating the Hotel Stewart and hold the company harmless therefrom and will assume and pay the note of Ella R. Ransom for the sum of $2000.00. The company to assume and pay all the liabilities incurred and now outstanding on account of the Hotel Jefferson and hold us harmless therefrom. All accounts to be brought up to May 1st, 1908. And this offer to take effect as of that date.       Very respectfully,

"'CHAS. A. STEWART,
"'MARGARET STEWART.'

"Upon motion of Director Jno. W. Mason and second of Director T. W. Nowlin it was resolved that the said proposal of Chas. A. Stewart and Margaret Stewart, as submitted, be accepted by this company and that the president and secretary be, and they are hereby, instructed and empowered to execute on behalf of the company whatever instruments may be required to effect the transfer covered by said proposal, and that the stock received from said Chas. A. Stewart and Margaret Stewart on account of said transfer be turned into the treasury of this company. Said resolution was unanimously adopted by the vote of the directors present, excepting the directors Chas. A. Stewart and Margaret Stewart who abstained from voting on said resolution.

"Adjourned.

"T. W. NOWLIN, Secretary."

The transaction was consummated by bill of sale of the furniture and equipment of the Hotel Stewart executed by the corporation to the Stewarts, taking date, however, of May 1, 1908. The bill of sale recited that the conveyance "is made without reservation on the part of said first party (the corporation) but subject to all outstanding claims for the purchase of said described personal property or any part thereof, which said claims the second parties (the Stewarts) have assumed and agreed to pay holding said first party free from all liability therefor." The assignment of the lease declared that it was "intended as a cancellation of said lease and merger of the same in the said parties of the first part therein named" (the Stewarts). The proposition of the Stewarts was that "all accounts to be brought up to May 1st, 1908.

And this offer to take effect as of that date''; and this was the date at which the relation of the corporation to the business of the Hotel Stewart ceased. At this point it may be stated, as found by the court, that the Stewart Estate Company, plaintiff in action 39,901, "since the 30th day of April, 1908, has been a corporation duly organized," etc., and that, on May 20, 1908, the Stewarts conveyed to the Stewart Estate Company, by grant deed, the said lots and hotel buildings on Geary Street and the leasehold property. The Stewarts, Charles and Margaret, hold all the stock in the Stewart Estate Company and went into possession and control of the Hotel Stewart at the date of the transfer by the Stewart Hotel Company, and ever since have been in possession and control of said property, receiving to its use the issues and profits thereof. Says the brief of appellants: "The principal legal question involved is whether the transaction of May 12th, 1908, between the defendant Stewart Hotel Company, on the one hand, and the plaintiffs Charles A. Stewart and Margaret Stewart on the other, while acting as directors and stockholders of that corporation, violated section 309 of the Civil Code.''

This section provides as follows: "The directors of corporations must not make dividends, except from the surplus profits arising from the business thereof; nor must they create any debts beyond their subscribed capital stock; nor must they divide, withdraw, or pay to the stockholders, or any of them, any part of the capital stock, except as hereinafter provided, nor reduce or increase the capital stock, except as herein specially provided. . . . Nothing herein prohibits a division and distribution of the capital stock of any corporation which remains after the payment of all its debts, upon its dissolution, or the expiration of its term of existence.''

In their answers and cross-complaints it is sought to have the transfer of said lease to the Stewarts declared to be a nullity; that plaintiffs be required to account for the rents, issues, and profits of said real and personal property from the first day of May, 1908, for reasonable attorney's fees, for judgment against plaintiff Stewart Estate Company and the cross-defendants, Charles A. and Margaret Stewart, for the amount found due upon such accounting, and quieting the title of defendants to said leasehold and personal property.

The court adjudged the plaintiffs to be "the absolute owners of the property described in the complaint herein, and are entitled to the exclusive possession thereof," and that "defendants have not, nor has either or any of them, any right, title, interest or claim in or to the property described in the complaint." Defendants appeal from the judgment and from the order denying the several motions for a new trial.

It becomes necessary to state such further findings of fact as formed the basis of the court's conclusions of law and judgment. We quote from the findings in action 39,901. Following finding XIII, above quoted, the court found:

"XIV. The court finds that if attachment proceedings had been instituted by said W. & J. Sloane Company or the other creditors, or bankruptcy proceedings had been instituted by them, it would have involved the defendant Stewart Hotel Company in heavy loss and possible ruin.

"XV. The court finds that on said twelfth day of May, 1908, and for some time prior thereto, the lease that defendant Stewart Hotel Company had of said Stewart Hotel property was proving a heavy burden and a liability, which said Stewart Hotel Company was at that time unable to meet."

The court found that at the time the Stewarts' proposal was acted upon all the stockholders of the Stewart Hotel Company were present "save and except (interveners) Caroline B. Detwiler and De Etta A. Detwiler," and as to them the court found that they "had notice and knowledge of said sale of said property and the assignment of said lease and the circumstances surrounding the same, within a short time, not exceeding ninety days, after the twelfth day of May, 1908; and that said interveners Caroline B. Detwiler and De Etta A. Detwiler did not at any time protest or object thereto and did, by their failure to protest and object thereto, acquiesce in said transaction."

As to the motive for entering into the transaction the court found as follows:

"XXI. The court finds that for the purpose of saving the defendant Stewart Hotel Company from financial loss and ruin, and for the purpose of relieving said Stewart Hotel Company from the burden of the indebtedness incurred in the equipment of the Hotel Stewart, and for the purpose of relieving said Stewart Hotel Company from the burden and liability of the lease held by it, and for the purpose

of saving to the defendant Stewart Hotel Company the valuable and profit-paying asset of the Hotel Jefferson, and for the purpose of making said Stewart Hotel Company a going profit-making concern instead of a financially burdened corporation, the proposal made by said Charles A. Stewart and Margaret Stewart, hereinbefore in these findings referred to, was accepted by the defendant Stewart Hotel Company after a full and fair discussion." Also as follows:

"XXV. The court finds that the consideration paid by said Charles A. Stewart and Margaret Stewart for the conveyance and delivery to them of said hotel plant, furniture, furnishings and equipment, together with the assignment, cancellation and surrender of said lease, was a full, fair and adequate consideration, and was at the time believed by all the stockholders of said Stewart Hotel Company to be such.

"XXVI. The court finds that all the stockholders and directors present at the meeting of May 12, 1908, believed said proposal and its acceptance and the transfers made in pursuance thereof, to be for the best interests of the defendant Stewart Hotel Company, and believed them to be absolutely necessary to save said Stewart Hotel Company from serious loss or financial ruin, and they acted upon said belief in accepting said proposal.

"XXVII. The court finds that immediately after the twelfth day of May, 1908, there was a complete novation of all the indebtedness of the defendant Stewart Hotel Company arising out of the equipment, furnishing and operation of the Hotel Stewart, by and through which the Stewart Hotel Company was relieved of all of its debts aggregating, as hereinbefore found, more than ninety thousand dollars; and said debts were, with the knowledge and consent and ratification of the creditors of the Stewart Hotel Company, assumed by said Charles A. Stewart and Margaret Stewart personally, and were fully paid by them prior to the time of the commencement of this action. . . .

"XXIX. The court finds that the capital stock of defendant Stewart Hotel Company was not reduced or withdrawn or divided or paid over in any manner, or in any sum, by reason of the proposal and acceptance of May 12, 1908, or by reason of the bill of sale, transfer or delivery of the furniture, equipment, furnishings and hotel plant, or by reason of the assignment, cancellation or surrender of the lease or

the transfer to the defendant Stewart Hotel Company of said two thousand shares of stock; and further finds that it was not reduced, divided or withdrawn in any manner or for any amount, by reason of any fact alleged in any of the pleadings in this action.

"XXX. The court further finds that neither the capital stock nor the assets of said corporation were divided, withdrawn, paid over, diminished or impaired in any manner; and further finds that the leasehold of said Hotel Stewart had no value of any kind."

It was further found that the Stewart Hotel Company continued in business for more than three years after said proposal and agreement, "and no objection was at any time made to said proposal and agreement and the consummation thereof, by any of the stockholders of said corporation until the year 1912"; that all the terms and conditions of said proposal and its acceptance long prior to the commencement of this action "were fully performed, kept, discharged and executed"; that all the debts of the Stewart Hotel Company owing by it on May 12, 1908, have since said time and before the commencement of this action been fully paid and discharged; that all of the outstanding stock of said company amounts to 5,660 shares, and that there is not now in the treasury of said company the two thousand shares which were transferred to it by the Stewarts, and that said stock so transferred "has, since the transfer thereof, been in whole or in part reissued by defendant Stewart Hotel Company." It was further found that the transactions done under the proposal of May 12, 1908, "were not void nor voidable, but that each of them was duly and regularly and legally done without fraud or fraudulent intent and for a full, fair and adequate consideration"; that the Stewarts conveyed said property to the Stewart Estate Company on May 20, 1908, and that said company acquired said property "with full knowledge of the facts in these findings made," and that said conveyance to said company was not made in collusion with said Stewarts or either of them, "nor was it made to defeat the claims of defendants or interveners, or anyone else."

It cannot be disputed that in transferring to its stockholders, Charles and Margaret Stewart, the lease and plant of the Hotel Stewart, the directors of the Stewart Hotel Company were disposing of the company's capital stock—

that is to say, of its capital or assets. Among the numerous cases cited by appellants as explanatory of the statute are: *Martin* v. *Zellerbach*, 38 Cal. 309, [99 Am. Dec. 365]; *Kohl* v. *Lilienthal*, 81 Cal. 378, [6 L. R. A. 520, 20 Pac. 401, 22 Pac. 689]; *Tapscott* v. *Mexican Colo. etc. Co.*, 153 Cal. 667, [96 Pac. 271]; *Schulte* v. *Boulevard etc. Co.*, 164 Cal. 464, [Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156, 129 Pac. 582].

The general rule is so thoroughly well settled that any discussion concerning its application ordinarily would be superfluous. Meeting the position of respondents that the facts here furnish an exception to the rule, appellants say: "Let it be conceded for purposes of the argument only that the transaction by which a corporation attempts to exchange its assets for certificates of stock held by a stockholder might be beneficial from the standpoint of the corporation, yet, nevertheless, we insist as a proposition of law that it is no more valid than if such transaction were a detriment to the corporation, for the simple reason that it is a transaction prohibited by statute." As we view the case, and as appellants seem to view it, this statement presents the principal question submitted for decision. Appellants cite *Martin* v. *Zellerbach*, 38 Cal. 309, [99 Am. Dec. 365], and *Kohl* v. *Lilienthal*, 81 Cal. 378, [6 L. R. A. 520, 20 Pac. 401, 22 Pac. 689], as decisive of the question. On the other hand, respondents, while conceding the general rule to be as claimed by appellants, contend that "like all general rules, however, it is subject to certain well-recognized exceptions," which, "instead of weakening or destroying the rule, indicate most clearly the philosophy of it"; that "in this state we have no law in terms forbidding a corporation to acquire its capital stock"—i. e., its shares; that "the acquisition by the corporation of its capital stock is not, *ipso facto*, void." It is pointed out that the statute (Civ. Code, sec. 343) provides that a corporation may acquire its own stock under the assessment scheme provided by law; that a corporation may likewise acquire its own stock in payment of a debt owing by a stockholder to it, or to secure it from loss; (*Ralston* v. *Bank of California*, 112 Cal. 208, [44 Pac. 476]); and it may be compelled to buy back its own capital stock if at the time of its issue it contracted to do so. (*Schulte* v. *Boulevard Gardens Land Co.*, 164 Cal. 464, [Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156, 129 Pac. 582].)

In the Zellerbach case (38 Cal. 300, [99 Am. Dec. 365]), two corporations, the Eureka Lake Company and the Miners' Ditch Company, owning in severalty several water ditches, and having no interests in common, agreed to form a new corporation, to be called the Eureka Lake Water Company, to which each should convey all its property, the stock of the new corporation to be distributed in certain proportions to the *stockholders* of said two old corporations. The Eureka Lake Company was indebted to plaintiff in the action, who obtained a judgment against it and became the purchaser of its property under execution sale, obtaining the sheriff's deed therefor. Before plaintiff obtained the judgment the defendant recovered a judgment against the new corporation and became the purchaser of the whole of its property upon execution and obtained a sheriff's deed therefor. Plaintiff sued to recover possession of the property which he had bought and the foregoing facts were set up as an equitable defense. It was the property of the Eureka Lake Company that was in controversy. The court, after saying that the transaction as agreed upon and attempted to be carried out, if effectual in law, would of necessity have resulted in an alienation of the entire property and capital of the Eureka Lake Company, and that not a dollar would have remained to satisfy the demands of creditors, said: "The contract was that this stock [in the new corporation] was to be issued, and it was afterward issued, *directly to the stockholders* of the Eureka Lake Company. It does not vary the principle that the consideration to be paid was stock instead of money. If the contract had been that, on the transfer of the property, the Eureka Lake Water Company would pay to the *stockholders* of the Eureka Lake Company one hundred thousand dollars in cash as the price of the property, the legal proposition involved would have been precisely the same as in this case. In either case the consideration would have been paid, not to the trustees, as a fund primarily liable to creditors, but to the *stockholders,* for their own use." It will be observed that the point decided was that the shares of the new company representing, as they did, the capital or assets of the corporation, could not be divided or distributed to the *stockholders,* for it would in effect be a distribution of the capital and was expressly forbidden by statute.

The court said: "We wish it to be expressly understood, that our decision is limited to the precise facts, as disclosed by the record. That it may not be regarded as covering broader grounds than intended, we deem it proper here to say, that we express no opinion upon the question whether property of the kind in question may be transferred by parol and the delivery of possession, or whether, if there are two rival corporations, like the Eureka Lake Company and the Miners' Ditch Company, organized for the same purpose of supplying water to a mining region where the demand is limited, which, in consequence of the greater expense of managing the two separately, and the competition, are both doing business at a loss, and are liable to become insolvent, it would not be lawful, in pursuance of their interests, to form a new corporation for the same purpose, and convey the property of both to such new corporation in the manner pursued in this instance, provided the new corporation, as a part of the arrangement, should assume and become obligated to pay all the debts of the old corporation. Such an arrangement might be for the interest of all parties, creditors as well as stockholders, and if lawful, would be valid as to all. The personal liability of the stockholders, in such case, would continue, and no property would be withdrawn from liability to the creditors' demands. The prohibition of the thirteenth section of the act concerning corporations is directed against the trustees, and seems designed to protect creditors as such, and also to protect the stockholders against their mismanagement in distributing capital stock in the form of dividends, with a view of holding out the idea that the corporation is more prosperous than it is, for the purpose of promoting some unlawful object. If all parties interested are secured from injury, and the purpose is a lawful one, the object of the provision would seem to be accomplished, and there would be no one entitled to complain. Such a transaction was regarded as lawful in *Treadwell* v. *Salisbury Mfg. Co.,* 7 Gray (Mass.), 393, [66 Am. Dec. 490]. But we do not intend to express any opinion on these grave questions now, for no sufficient facts are presented in the pleadings or findings to require it, and we only allude to the questions in order to guard our opinion in so important a case from misconstruction or misapprehension."

The Lilienthal case (81 Cal. 378, [6 L. R. A. 520, 20 Pac. 401, 22 Pac. 689]), involved a similar question. There two mining corporations, the Head Center Consolidated Mining Company, a California corporation, and the Tranquility Mining Company, a New Jersey corporation, owning contiguous mining claims, formed a new corporation, to which they severally conveyed their mines, the new corporation, called the Head Center & Tranquility Mining Company, paying therefor one hundred thousand shares of the stock to the new company to each of the two corporations. The case related to the shares issued to the Head Center Company. The ground conveyed by this company to the new company did not comprise all the property of the Head Center Company and it still continued to carry on corporate business and reducing ores. It was not free from debt and afterward levied an assessment and paid up its then existing indebtedness. Its term of corporate existence had not expired and the company had not disincorporated. Plaintiff Kohl and others commenced the action against the Head Center Company and certain of its officers, alleging ownership in certain of the one hundred thousand shares of the new company so received for the sale of the property of the Head Center Company. Defendants claimed that these shares were the property and assets of the Head Center Company; that the company had no right under the law to distribute them to its *stockholders* and that its directors were entitled to represent and vote them at all meetings of the new company. Plaintiffs had judgment in the lower court and on appeal the judgment was reversed. Among other things, the court said: ''There is, however, one other fact found by the court, necessary to the support of its judgment, if under the law it could be supported at all, but which finding we do not think is supported by the evidence. That finding is, that it was 'mutually understood and agreed by and between the stockholders of both the old companies, that the stock of the new company should be equally divided between and belong to the *stockholders* of the old companies.' '' It was not decided that the consolidation was illegal. The point decided was that the *stockholders* of the old Head Center Company (plaintiffs being such) were not entitled to have their proportion of the stock of the new company distributed to them, for the reason, given in the

Zellerbach case, that it would in effect be distributing the capital or assets of the Head Center Company.

So it was held in *San Francisco etc. R. R. Co.* v. *Bee,* 48 Cal. 398, 405: "It was not competent to the members of that corporation to dissipate this fund and place it beyond the reach of creditors by merely going through the process of re-incorporation, taking on a new corporate name, transferring the assets of the old corporation to the new one without consideration, and *issuing the capital stock in the new corporation to the holders of the capital stock of the old corporation.* This transaction involved a breach of positive statute law.".

We will next notice two of the many cases cited by respondent.

In *Ralston* v. *Bank of California,* 112 Cal. 208, [44 Pac. 476], one Baum held a certificate for sixty of defendant's shares, which provided that no transfer of the stock would be made on the books until payment of all indebtedness due the bank from the stockholder in whose name the stock might stand. In 1881 Baum transferred the stock to Sather, who, on September 13, 1886, demanded the transfer of the stock. Baum was then indebted to the bank beyond the value of the stock. The demand was refused. Soon after, Sather died and, in April, 1888, said shares were distributed to plaintiffs in trust under Sather's will. On March 10, 1887, the bank sold and transferred to Greenebaum & Co., at a large discount, the indebtedness held by it against Baum. On July 3, 1888, plaintiffs demanded registry of the transfer of the stock, which was refused unless plaintiffs would pay the balance of its claims against Baum above the amount received from Greenebaum & Co. The action was in trover for the conversion of the shares. Defendant recovered in the trial court and on appeal the judgment was reversed and a judgment directed in favor of plaintiffs for the value of the shares at the time the second demand was made, and interest from that date. We quote from the opinion:

"The argument that the corporation becomes the owner of the shares converted, and hence that its stock is reduced otherwise than in the manner provided by law (Civ. Code, sec. 359), and hence further that such conversion is legally impossible because contravening the policy of the law, has no great force. If necessary to save itself from loss, the bank might have contracted for and have received the title to these

shares in payment of Baum's debts to it, and the transaction would have been perfectly legal. (*Ex parte Holmes,* 5 Cow. (N. Y.) 426.) With the same purpose in view the bank, apparently in good faith and under claim of right, refused the registry, and this had the undesigned effect of converting the shares; and it is not perceived how acquisition of title by this means can, though wrongful as regards the plaintiffs, be more obnoxious to public policy than by contract in the case supposed. The authorized capital is not reduced, for the shares are not extinguished, but may be reissued. (Cook on Stocks and Stockholders, sec. 314; Morawetz on Corporations, sec. 434; *Bank of San Luis Obispo* v. *Wickersham,* 99 Cal. 655, [34 Pac. 444].)"

The court said it would be legal for a corporation to take the shares of a stockholder in discharge of his indebtedness. Now, the stockholder's liability to the corporation is an asset—an account or bill receivable. If he is solvent and able to pay, the bank would have no more right to exchange this asset for his stock than to buy the stock outright. What the court meant and in fact said was, that to save itself from loss the bank might do this, though under a strict application of the rule it would violate section 309 of the Civil Code. In short, here was an exception to the rule.

*Schulte* v. *Boulevard Gardens Land Co.,* 164 Cal. 464, [Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156, 129 Pac. 582], was a case where, coincidentally with his subscription to the stock of defendant company, a written agreement was entered into between the latter and plaintiff that the company would repurchase the stock subject to the terms stated. The action was on the contract, plaintiff offering and being in a position to restore the shares. Defendant had judgment on its demurrer to the complaint and plaintiff appealed. The supreme court reversed the judgment and ordered that the demurrer be overruled with leave to defendants to answer. As stated in the opinion: "The position of the respondent is that the contracts for the retaking by the corporation of its own shares are illegal and void, as in violation of the provisions of section 309 of the Civil Code, prohibiting directors of corporations from dividing, withdrawing or paying to the stockholders, or any of them, any part of the capital stock, or from reducing or increasing the capital stock, except as provided in the section." After showing that the phrase, "capital

stock," as used in the section, means the assets and not the shares, and also pointing out that, "although the prohibition runs, in terms, only against the directors, the effect of the section is to deprive the stockholders as well of power to do the forbidden acts" (citing cases), the opinion proceeds: "In other jurisdictions, the authorities show a sharp conflict over the question whether, in the absence of any statutory or charter restrictions, a corporation may employ its assets for the purchase of shares of its own stock. (Cook on Corporations, · 6th ed., sec. 311.)   But in view of the code provisions to which we have referred, it cannot be doubted that, in this state, a corporation is not authorized to make such purchase, since the result would be to illegally withdraw, and pay to a stockholder a part of the 'capital stock.' (*Bank of San Luis Obispo* v. *Wickersham,* 99 Cal. 655, 661, [34 Pac. 444].)   The want of power to buy its own stock does not prohibit a corporation from taking the stock in satisfaction of a loan, or when otherwise necessary to save itself from loss (*Ralston* v. *Bank of California,* 112 Cal. 208, 213, [44 Pac. 476]), but the general rule is, as above stated, that the purchase is unauthorized.   Thus, this court has condemned, as in violation of section 309, a by-law assuming to give to any stockholder, the right, upon sixty days' notice, to withdraw from the corporation, and to receive, upon surrender of his stock, the amount · paid therefor. (*Vercoutere* v. *Golden State L. Co.,* 116 Cal. 410, [48 Pac. 375].)"

It would serve no useful purpose to review all of the many cases, English and American, cited by counsel in their elaborate briefs.   The entire field of the law upon the question seems to have been swept clean of cases and text-books bearing upon it.   The inquiry is simmered down, we think, to the basic question, Does the general rule, as to which there is no controversy, admit of no exceptions?   If not, the decision of the lower court was wrong.   If the rule admits of exceptions, the question is, Do the facts here constitute an exception?

We need go no further than to *Ralston* v. *Bank of California,* 112 Cal. 208, [44 Pac. 476], and *Schulte* v. *Boulevard Gardens Land Co.,* 164 Cal. 664, [Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156, 129 Pac. 282], to find exceptions to the rule.   In the Ralston case the court said: "If necessary to save itself from loss, the bank might have contracted for and received title to these shares in payment of Baum's debts to

it, and the transaction would have been perfectly legal." In the Schulte case, after having stated the general rule, the court said: "The want of power to buy its own stock does not prohibit a corporation from taking the stock in satisfaction of a loan or where otherwise necessary to save itself from loss." What did the court mean when it said that a corporation not only might take its stock in satisfaction of a loan *or when otherwise necessary to save itself from loss?* We feel authorized to assume that the court meant to say that circumstances might arise other than such as appeared in those two cases where the corporation would be justified in taking over the shares of one of its stockholders, and that each case must be governed by its own peculiar facts; that the general rule, though well settled in this state, is not inflexible and unyielding.

The benefit or loss to the corporation in the present case must be determined from the situation of the parties and the property involved at the time the proposal of the Stewarts was accepted. The contract was fully executed and no objection from directors or stockholders was suggested for nearly four years, and then only by the Detwilers, who, the court found, had notice of the contract shortly after it was entered into. And all liabilities existing at that time have been fully paid. Clearly, the court, from its view of the contract, did not err in refusing defendants the right to go into the question of the profits and losses to the Stewarts in operating the Hotel Stewart. It is now quite impossible for defendants to place the parties back where they stood in May, 1908, and they do not offer to do so. They say that this is not required of them because the transaction was absolutely void *ab initio.* What, then, were the facts upon which the learned trial judge based his decision?

Briefly epitomized, the facts were as follows: The Stewart Hotel Company was operating the Hotel Jefferson at a large profit monthly. The net earnings for January, February, March, and April, 1908, amounted to about eight thousand dollars. Believing it could extend its hotel business profitably by operating the Hotel Stewart, it leased the premises from the owners, the Stewarts, and proceeded to equip the hotel at a cost of over one hundred and six thousand dollars. It opened the Hotel Stewart in the latter part of November, 1907, and operated it about five months at a loss of over eight

thousand dollars. In April, 1908, it found itself indebted about ninety thousand dollars for furnishings, and one of its largest creditors, Sloane & Co., whose claim amounted to about fifty thousand dollars, was pressing payment and threatening to close the hotel or otherwise proceed to collect its claim through suit. All efforts to obtain further extension of credit or obtain loans from banks had failed. The corporation also owed the Stewarts one month's rent and two thousand dollars on a promissory note past due. In this situation of its financial affairs, the Stewarts made the proposal, which was consummated, to take over this lease and to assume the liabilities above referred to and surrender to the corporation their two thousand shares of its stock, of the par value of twenty thousand dollars. These shares were not extinguished, nor were they distributed to the stockholders, but were placed in the treasury and, as the court found, have since that time been "in whole or in part reissued or used by defendant Stewart Hotel Company." The testimony of Mr. Rich, manager of the Palace Hotel, was that the plant transferred to the Stewarts "might possibly have been worth seventy thousand dollars." Mr. Woods, manager of the Hotel St. Francis, testified: "In view of the conditions that obtained at that time, I would place the value at what the equipment cost, less twenty-five per cent. In other words, if the equipment cost one hundred and six thousand dollars I would deduct from that twenty-five per cent, and I would call that the value of the entire plant including the leasehold and everything of the kind." There was evidence, and the court found, "that the leasehold of said Hotel Stewart had no value of any kind." The value of the equipment and the supplies on hand, according to the testimony of Rich and Woods, was several thousand dollars less than the amount of the liabilities which the Stewarts assumed and paid. The books of the company showed liabilities amounting to over one hundred and ten thousand dollars, while the assets, as testified to by Woods and Rich, had a value of about eighty-six thousand dollars. The Stewarts not only took over and subsequently paid these liabilities, but surrendered their two thousand shares in the company. Had the Stewarts retained these shares, no possible question could have arisen as to the legality of the transaction, for it was within the powers of the corporation and apparently very beneficial. It is beyond

question, too, that in the surrendering to the corporation by the Stewarts of their two thousand shares the benefit to it was increased to the extent of their value. We cannot see that the transfer of this stock effected a diminution or reduction of the assets of the corporation, nor can it reasonably be said to have been a trafficking or bargaining by the company in its capital stock. The complexion of the transaction must be judged in its entirety. There was no evidence of overreaching or unfairness, no semblance of fraud in the transaction. Mr. Stewart, acting with other directors, made every reasonable effort without avail to obtain extensions of credit or effect a loan to tide over the emergency, and it was only by mortgaging the fee to the real property as well as the personal property that the Stewarts were able to make satisfactory arrangements with creditors. The principal asset of the corporation remaining after the transfer of the Hotel Stewart plant was the Jefferson Hotel, fully equipped and operating at a profit. The company was solvent. Its monthly profits about equaled its losses on the Hotel Stewart. Unquestionably the transaction not only brought a substantial benefit to the corporation but was "necessary to save itself from loss" and threatened bankruptcy. The corporation relieved itself and its stockholders of a large indebtedness and of a losing venture and had remaining its only asset of value, which value was increased by taking the Stewarts' shares. Without going further into the surrounding circumstances, we think the facts furnish an exception to the general rule and that the transaction was valid.

Other questions are presented in the briefs covered by the findings, but as all parties seem to agree that the case must turn upon the legality or illegality of the contract between the directors and the Stewarts, our conclusion on the point renders further consideration of the case unnecessary.

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 3, 1917.