[Civ. No. 6466. Fourth Dist. June 28, 1961.]

ARMSTRONG MANORS (a Corporation) et al., Appellants, v. WILLIAM W. BURRIS et al., Respondents.

Raymond R. Farrell and William H. Neblett for Appellants.

Penney & Penney, James F. Penney, Gray, Cary, Ames & Fry, Ward Waddell, Jr., and John Cranston for Respondents.

SHEPARD, J.—This is an action to quiet title in plaintiff-appellant Armstrong Manors, a corporation, hereinafter called "Corporation," in the real and personal property of the Del Mar Hotel, with a second cause of action to establish a constructive trust in the same properties in favor of Corporation. Defendants-respondents Burris and Merritt, hereinafter called "Burris," cross-complained in eight counts on various claims for money judgment.

### The Pleadings

Appellants' complaint is in two counts, first, in the ordinary form of quiet title action, with a second count seeking to establish a constructive trust. However, both counts rely upon essentially the same facts and therefore will be treated as one. (*Tiedje* v. *Aluminum Taper Milling Co.,* 46 Cal.2d 450, 452 [1] [296 P.2d 554].)

In general essence, appellants' cause of action is based on the allegation that Burris took title to the entire property without consideration and on an agreement to act as trustees for the use and benefit of Corporation, and that Burris thereafter fraudulently asserted title in themselves and sold the property to respondents Navarro, Lozano and Loreto (who will be hereinafter called "Navarro"). Appellants Mary G. Armstrong, Olive Armstrong Fox and Armelda Armstrong Mendoza, when hereinafter referred to individually, will be called "Mary," "Olive" or "Armelda," respectively, and when referred to collectively will be called "Armstrong family." Estoppel, laches and waiver are pleaded in the various answers.

## The Pretrial Order

In general substance, the issues as set forth in the pretrial order involve questions relating to (1) whether or not there was an agreement of trusteeship in the sale to Burris; (2) whether or not such transfer rendered Corporation insolvent; (3) whether or not any of appellants ought now to be permitted to assert their alleged claims; (4) whether or not appellants ratified the transaction; (5) whether or not appellants were guilty of laches; (6) what amount of unpaid rent, taxes and insurance is due to Burris from appellants; (7) whether or not the claims were, in fact, assigned to Burris; (8) whether or not Burris were personally liable on such claims and whether or not they were entitled to contribution; (9) whether the furniture and equipment were pledged by the lease; (10) whether the promissory note of J. Leroy Wood was executed for a legal consideration and whether or not Burris must first enforce against the Corporation; (11) whether or not the corporate stock was pledged as security for payment of said note and the ownership of said note; (12) attorneys' fees; (13) interest; (14) whether or not there was fraud and conversion of the hotel property by Burris; and (15) the sufficiency of appellants' fraud allegations.

### Facts

In 1955 the Del Mar Hotel owners were in bankruptcy and the hotel was for sale. Olive organized Corporation, secured a conditional permit from the Corporation Commissioner for issuance of 590 shares of stock at $20 per share to herself, her mother, Mary, and her sister, Armelda. Olive proposed to buy the Del Mar Hotel properties, believing that they could be profitably operated as a home for aged, life-care patients. She paid $10,000 for an option to buy the hotel properties at a total purchase price of $550,000, to be paid for by $88,000 cash (of which the option money was a part) and the assumption of three trust deeds, (first, $250,000; second, $62,000; and third, $150,000, totaling $462,000). Until two days prior to the expiration of her option, she was unable to raise the additional $78,000 cash. She then met Burris and persuaded them to come into the operation with their money, representing to them that she had applications of about 50 aged people from which $500,000 to $600,000 could be realized for the operation. Burris acceded, advanced $78,000, of which $5,900 was for 50 per cent or 295 shares of Corporation stock and the balance, or $72,100, was loaned to Corporation. Olive

then assigned the option to Corporation and title was taken in its name September 19, 1955. Burris became two of the four directors of Corporation, and the Armstrong family held the other two directorships, with Olive as president and appellant Thomas Fox (who thereafter married Olive and is included in references herein to "Armstrong family") as secretary, and Mary the other director. From this commencement until Corporation quitclaimed to Burris in September 1958, the Armstrong family remained in operational control of Corporation and the hotel properties.

The morass of financial dealings that followed is too extensive to relate here in complete detail. In general substance it is as follows: By the spring of 1956, expenditures had so far exceeded income that Burris had loaned Corporation a total of $137,000 and Armstrong family had loaned $57,482.32, or total loans to Corporation from stockholders of $194,482.32. While some portion of this had been used in capital improvements, a very substantial portion had gone into operations. According to appellants' own witnesses, the operational loss had also raised current unpaid liabilities alarmingly by May 31, 1956. These included bank overdrafts, taxes of various kinds, borrowings from the trust fund, unsecured notes and pay roll accounts. The entire Armstrong family lived at the hotel without credits of any kind to Corporation. Corporate business was conducted with the usual informality of closely held stock. Counsel stipulated that Armelda and Mary were kept fully informed of all operations at all times. Olive testified, without contradiction, that everything she did was in accordance with their wishes. Differences arose between Burris and Armstrong family on methods of doing the corporate business and on Burris' claim that Olive incurred unnecessary and excessive operational expenses. After many discussions between all parties concerned, the decision was reached that one of the two factions should buy out the other.

April 29, 1956, all directors unanimously adopted a resolution by which Burris were authorized to enter into negotiations which would allow Corporation to consolidate existing trust deeds, and in order to accomplish same that the land and buildings be deeded to Burris, who would, in turn, lease the property back to Corporation. Apparently the exact details had not then been fully agreed upon. By May 16, 1956, such details had been worked out between Burris and the Armstrong family. By such transaction Burris purchased

the realty without the furnishings, assumed outstanding deeds of trust totaling $462,000, paid in cash $38,000 to settle certain of Corporation's immediately pressing current obligations, cancelled indebtedness of $137,000 owed to Burris by Corporation, surrendered 295 shares of stock for which they had paid $5,900, and leased the property back to Corporation.

The lease provided, *inter alia,* that Corporation tenancy be for a period of 55 years at a rental of $5,000 per month for the first six months and $8,000 a month thereafter; that Corporation should pay all taxes, upkeep and repairs; that Corporation pledged the furnishings as security for performance of its obligations under the lease; that Corporation be given an option to buy the entire property for the total purchase price of $800,000; that all payments of rent would be credited by lessors as payments on the purchase price if lessees gave written notice of election to exercise the option to purchase by June 15, 1957; and that lessors might recover attorney's fees from lessees in any action brought against lessees for breach or to recover rental. No additional payment of any kind was required as a prerequisite to lessees' exercise of the option.

All these matters having been fully agreed upon between the two factions, on May 16, 1956, the escrow with a title company was opened, into which escrow was deposited the deed, the lease, the certificates of stock of Burris, and the $38,000 cash above mentioned. Apparently the deed was recorded May 31, 1956, and possession under the lease took place June 15, 1956. However, settlement negotiations with large numbers of creditors kept the escrow open a considerable time. The stock certificates are recorded by the escrow clerk as being delivered out of escrow September 5, 1956. Olive signed approval of the statement of notes and stock certificates and the receipt for same appears to be signed by Thomas Fox on the same date, i.e., September 5, 1956. Thus, by September 7, 1956, essentially everything agreed to be done by Burris had been performed, and on that date the directors again met. The transaction, evidenced by the escrow dated May 16, 1956, above referred to, was unanimously ratified and approved. Burris tendered their resignations as directors, which were accepted. Thomas Fox and Armelda were immediately elected new directors, and the new directors immediately authorized the Corporation to indemnify, release and hold harmless Burris from any and all obligations, liabilities or causes of action arising from any of their actions or omissions as directors.

The Corporation's attorney, who had been originally employed by Olive, was present at the meeting. The indemnification agreement authorized by the directors was executed the same day. Armelda thereafter continued to act as director in the corporate affairs, along with Thomas Fox, Olive and Mary.

For about two years thereafter the Armstrong family operated the property through the Corporation and made various unsuccessful attempts to sell it. At one time full agreement for sale to Church of Religious Science was apparently fully agreed upon and an escrow entered into but the buyer ultimately failed to deposit sufficient funds to complete the sale. By September 1958, unpaid rent had risen to $127,500. In addition, other unpaid obligations of the lessees, which lessors were forced to pay, in the form of taxes, insurance, etc., amounted to $17,061.43. The Corporation then, with full knowledge and consent of the Armstrong family, voluntarily surrendered possession of all of the property to Burris and executed to Burris a quitclaim deed to its interest therein. Burris continued to pour money into the still sinking financial ship of the hotel. Illustrative of the financial embranglement after this transfer to Burris, Burris were forced to settle 43 separate claims against the Corporation in some form. The sum total is hard to arrive at from the evidence, but the recitation of 29 of such settled claims listed at one point in the evidence exceeds $55,000. They included a large number of tax and other governmental assessment liens by the United States and the State of California, material and labor liens, judgment liens, attachments for money loans, etc.

Finally, in May 1959, Burris, by replacing some of the heating and other fixtures found missing when they took over possession, replacing furniture in four rooms completely denuded thereof, and by adding a substantial piece of additional realty constituting about 850 feet of beach frontage so as to give the hotel ready beach facilities, were able to sell the entire property to respondents Navarro for the sum of $1,100,000. In the meantime, in March 1959, appellants commenced this action, and later filed a supplemental complaint to include Navarro as defendants therein.

References are made throughout the case to trust funds. These relate to sums received by Corporation on life-care contracts. These were to have been paid into a separately banked trust fund, but apparently this was only partially carried out. For the most part, they appear to have been

carried on the books of Corporation in that fashion but were actually used by Corporation or the Armstrong family in hotel operations. Burris, long after they ceased to be shareholders, paid off and took assignments on the life-care claims, apparently in order that the hotel title not become involved. Whatever the reason, the evidence shows that such payments were made and assignments so taken on claims represented by counts in the cross-complaint.

The court decided all issues in favor of respondents, rejecting appellants' constructive trust claims; giving judgment to Burris for $144,561.43, attorneys' fees, foreclosure of furnishings against Corporation on the first and seventh counts (accrued unpaid rent, taxes, insurance, etc. on lease), $9,815.29 against Corporation on the second cause of action (Elizabeth Phillips life-care contract), $19,159 on the third cause of action (Margaret M. Wood life-care contract), $19,144 on the fourth cause of action against Corporation and Olive and Thomas Fox (Lena M. Wood life-care contract, together with foreclosure of 295 shares of stock pledged as security therefor), $1,150.75 and specified interest and costs on the sixth cause of action (Audrey J. Quesenbury judgment). The seventh and eighth causes of action relate to the pledges of furnishings and corporate stock hereinbefore referred to.

## Validity of Transaction

Appellants first contend that the transactions purportedly authorized by the directors' meeting of April 29, 1956, the details of which were later worked out and which were finally ratified by the directors' meeting of September 7, 1956, amounted, in essence, to a purchase of shares of Corporation's own stock in contravention of Corporations Code, sections 1705-1707, or that they amounted to a declaration of dividend in violation of Corporations Code, section 824, or that they amounted to a withdrawal of assets in violation of Corporations Code, sections 5000 et seq. Counsel are in sharp disagreement as to whether or not any issue of this kind was before the trial court or open to consideration on appeal. (*Kleinsasser* v. *McNamara,* 129 Cal.App. 49, 61 [7] [18 P.2d 423]; *London* v. *Zachary,* 92 Cal.App.2d 654, 658 [4] [207 P.2d 1067]; *Munfrey* v. *Cleary,* 75 Cal.App.2d 779, 785 [4] [171 P.2d 750].) It is true that neither the pretrial statement nor the pleadings literally speak of anything of this kind as in issue. However, we think the facts and the law of the case make it unnecessary to discuss this question.

The facts, except as to certain comparatively immaterial matters and excepting those which might be classified as intent, are in no real dispute. ▮▮ Furthermore, as to any matters wherein there is a conflict, this court's duty *"begins and ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. . . ." (*Brewer* v. *Simpson,* 53 Cal.2d 567, 583 [1] [2 Cal.Rptr. 609, 349 P.2d 289]; see also *Key* v. *McCabe,* 54 Cal.2d 736, 738 [1] [8 Cal.Rptr. 425, 356 P.2d 169].)

▮ It must also be kept in mind that the code sections involved and upon which appellants appear to rely, were "enacted for the benefit of the corporation as a whole, its creditors and stockholders other than the participating stockholder." (*Tiedje* v. *Aluminum Taper Milling Co., supra,* at p. 455 [11].) Where the whole of the balance of the shares of the corporation are held by stockholders having full knowledge of and giving full consent to the transaction, the sale is neither void nor voidable. ▮▮ As was said in *Sargent* v. *Palace Cafe Co.,* 175 Cal. 737, 739 [167 P. 146]:

"A private corporation may exercise many extraordinary powers, provided all of its stockholders assent and none of its creditors are injured. There is no one to complain except the state, and, the business being entirely private, the state does not interfere."

The provisions of section 311 of our Civil Code are substantially incorporated in our present Corporations Code, section 820, which provides, in substance, that no transaction between a corporation and its directors is void or voidable because of the participation of a director where the directorship or financial interest is fully known to all concerned and the board approves or ratifies the transaction in good faith by a vote sufficient without counting the vote of the director involved, or where the directorship or financial interest is fully known to the shareholders and they approve or ratify the transaction in good faith by a majority vote or written consent of shareholders entitled to vote, or where the contract or transaction is just and reasonable as to the corporation at the time it is authorized or approved. Interested directors may be counted in determining the presence of a quorum. While proceedings here were of the informal type common to such circumstances, there can be no question under the evidence that the Armstrong family, holders of 100 per cent of the stock, fully approved and ratified what was done.

456

In the case here at bar, we are dealing with what is sometimes spoken of as a "closed corporation," in which all of the shareholders and directors had full and complete knowledge of everything that was going on and approved of every act which took place. We have neither allegation nor proof that any creditors are complaining. As was said in *Brainard* v. *De La Montanya*, 18 Cal.2d 502, 511 [116 P.2d 66]:

"We must therefore treat the stockholders in the present case as the 'only beneficiaries of the trust' and, under the findings, all that was done by defendant was done after full disclosure and with the full knowledge and consent of all said beneficiaries.

"It is immaterial that no formal directors' meetings were held. While it is true that a corporation ordinarily acts by resolutions which are adopted at formal meetings of its board of directors and are entered in its minutes, it is also true that decisions reached by all the directors and stockholders of a closed corporation at informal conferences will be binding upon the corporation when, by custom and with the consent of all concerned, corporate formalities have been dispensed with and the corporate affairs have been carried on through such informal conferences." See also *Tevis* v. *Beigel,* 174 Cal. App.2d 90, 99 [12-14] [344 P.2d 360]; *Fenolio* v. *McDonald,* 171 Cal.App.2d 508, 512 [4, 5] [340 P.2d 657]; *Scales* v. *Holje,* 41 Cal.App. 733, 737 [3] [183 P. 308].

 Thus, a transaction between a corporation and one of its directors is not necessarily either void or voidable. Where the full details of the entire transaction are known and approved by all persons concerned and the transaction is just and reasonable in the light of the circumstances appearing at the time it was made, no person can properly complain. This is the essence of the section and this is the essence of the various discussions of the courts of last resort.

 With these principles in mind, a review of the evidence shows that at all stages of the proceedings until final quitclaim by Corporation to Burris, this was fundamentally a transaction between the Armstrong family on one side and Burris on the other side. Olive was president of the board of directors and her husband, Thomas Fox, was secretary. The Armstrong family were in active control of operations. They wrote and kept the corporate records. They knew and at all times were in a far better position to know the true condition of all obligations of Corporation than were Burris. That Olive conducted all transactions after full consultation with

Armelda was stipulated by counsel. Olive testified, without contradiction, on behalf of appellants that she at all times performed all acts in accordance with the wishes of her sister, Armelda. Her mother, Mary, actively participated at all times. Armelda did not appear to testify and counsel have not contended that anything was done without the consent of all three acting together. Actually, the stock appears to have been held in joint tenancy between the three of them. The evidence clearly shows that whatever the book aspects of the stock transactions were, they had for their purpose the consolidation of corporate control in the Armstrong family, for the stock was immediately reissued to the members of that group in accord with common corporate procedure on transfer of stock between private shareholders. The Armstrong family entered into each of the transactions voluntarily and with full knowledge of the financial and physical facts. They appear to have been at all times in contact with competent legal counsel, and there is no contention to the contrary.

The financial situation was precarious for all involved. That it remained precarious after the transfer to Burris cannot be doubted. That the financial structure in which Burris found themselves, after finally taking the quitclaim deed and possession in 1958, did not crash upon their own heads can be attributed to their venturing further large capital sums (the records of the escrow of May 16, 1956, show that by January 1957, they had paid out through the escrow a total of $109,000) to satisfy demanding creditors and trust deed holders, to their salesmanship, their adjusting the price within buyers' views, and perhaps to some extent, good fortune. The mere fact that they were able to resell the property in 1959, along with other property, for $1,100,000 does not, by itself, establish that the original price which consisted of $642,900 and the 55-year lease and option, was unfair. The record shows respondents were immediately confronted in September 1958 with the necessity of producing additional sums of cash to protect the property from more than forty outstanding claims; that they added certain necessary fixture improvements to the property and several rooms of furniture; that they added 850 feet of beach frontage property to give hotel patrons ready access to the ocean. The complete detail of all that was added is difficult to ascertain from the record, but there also appears an item of about $95,000 for furniture. This is apparently the same furniture pledged to secure payments on the lease from Burris to Corporation, for which Burris must, in some form,

still pay. Counsel have not pointed to any evidence of concealment or failure to disclose any physical or financial fact, and we have found none.

A review of the entire record, giving consideration to the precarious financial condition of the property at the time Burris took title thereto convinces us that the court's findings that the transaction was fair and reasonable, that all actions were done with full knowledge of all parties concerned, that the transaction was ratified by appellants, and that appellants' allegations of false representations are untrue, are fully supported and justified by the evidence.

It is, of course, well settled in California that officers and directors act in fiduciary capacity and must do so in highest good faith towards the corporation and its creditors and shareholders. This has been evidenced throughout the judicial pronouncements on the subject. The following cases, cited by appellants, are evidence of the close scrutiny that all courts give to the actions of those who act in such capacity in dealing with corporations: *Hedges* v. *Frink*, 174 Cal. 552 [163 P. 884] (decided when Civ. Code, § 311, as it is now contained in Corp. Code, § 820, was not in existence) ; *Stewart* v. *Stewart Hotel Co.*, 33 Cal.App. 167 [164 P. 620] (same category) ; *Tiedje* v. *Aluminum Taper Milling Co., supra* (reversing dismissal judgment on sustaining of general demurrer to complaint alleging complainant ignorant of true facts, thus excluding the case from both the statutory exceptions rule (§ 820) and the *in pari delicto* rule) ; *Mindenberg* v. *Carmel Film Productions, Inc.*, 132 Cal.App.2d 598 [282 P.2d 1024] (fraud and conspiracy charged but not proved on dispute over sale of corporate stock, judgment for plaintiff reversed) ; *Pepper* v. *Litton*, 308 U. S. 295 [60 S.Ct. 238, 84 L.Ed. 281] (action by trustee in bankruptcy on behalf of creditors to set aside unconscionable preference).

In more recent years the various code sections hereinbefore referred to, and many others, have placed close restrictions upon the acts of officers and directors, especially where their own interests are involved in possible conflict with those of the corporation, the shareholders or the creditors. However, all of the statutory enactments and all of the rules set up by courts have but one object. That object is the protection of shareholders and creditors from unfair transactions by which officers or directors, and sometimes shareholders, attempt to milk the corporate assets to the detriment of creditors or shareholders who from ignorance of the facts, lack of corporate

control, or other reasons, are unable to protect themselves. None of such circumstances, of course, are present in the case at bar, and the cases cited by appellants are clearly distinguishable on the facts and, in the ultimate analysis, express nothing contrary to the views herein set forth.

## INSOLVENCY CONTENTION

Whether or not the alleged statutory bar to a transfer rendered Corporation insolvent would apply where all directors and shareholders agree to the transaction and no creditors object, need not be seriously discussed because the facts and the findings of the court do not show insolvency. Appellants' arguments are based on a factual pessimism not justified by the findings of the court nor by the facts as the trial court was entitled to see them, and as they appear to have been weighed by appellants at the time the transfer to Burris was entered into. Corporation, after the transfer of the realty had been accomplished, was relieved of current debts to the extent of about $175,000. Its entire stock had been consolidated into the ownership of the Armstrong family. It owned approximately $95,000 worth of furniture. It had acquired a 55-year lease on the property, with an option to repurchase which required no prerequisite for exercise except a written notice thereof on or before June 15, 1957. It had also been released from trust deed obligations in the amount of $462,000. It had acquired time to look for buyers. That this time element was valuable is attested by the fact that appellants almost sold on two different occasions, on one of which the parties actually went to escrow for a price of $1,500,000. If this had materialized, Corporation, and thus the Armstrong family who were now the sole shareholders, would have netted a profit in the neighborhood of half a million dollars. A good many causes why appellants did not ultimately sell the property at a substantial profit to themselves, including the possibility that they sought to hold the price too high, could be reviewed, but we deem such discussion profitless here.

It must be remembered that liability upon which the judgment for Burris against Corporation in the amount of $144,561.43 was rendered, all accrued from Corporation's operations after the sale to Burris, and while the Armstrong family were in complete control. Thus it will be seen that said judgment for Burris is in no way connected with the $175,000 debt Corporation was relieved of at the time of sale. The

460

record amply supported the trial court's conclusion of fair dealing by Burris.

The question of fairness is ordinarily one of fact for the trial court and its decision will not be disturbed unless it appears from the record that such decision cannot be supported upon any reasonable view of the evidence and the inferences to be drawn therefrom. (*Caminetti* v. *Prudence etc. Ins. Assn.*, 62 Cal.App.2d 945, 951 [6] [146 P.2d 15]; *Bennett* v. *Lenoir*, 96 Cal.App.2d 524, 530 [1] [216 P.2d 38]; *Kleinsasser* v. *McNamara, supra*, 60 [5]; *Industrial Indem. Co.* v. *Golden State Co.*, 117 Cal.App.2d 519, 534 [14, 15] [256 P.2d 677]; *Chase* v. *Super-Cold Corp.*, 163 Cal.App.2d 83, 88 [4] [328 P.2d 812].)

We find no merit in appellants' contentions regarding contended insolvency. The authorities cited by appellants are in no way contrary to the views herein expressed. *Remillard Brick Co.* v. *Remillard-Dandini Co.*, 109 Cal.App.2d 405 [241 P.2d 66], involved four family-owned corporations and alleged unfair advantage gained in their dealings. It is there stated (pp. 418 [7], 420 [19, 20]):

"Even though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided."

" 'The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.' "

*Pepper* v. *Litton, supra*, was discussed above; *Union Die Casting Co., Ltd.* v. *Anderson*, 25 Cal.App.2d 195 [76 P.2d 703], involved unfair royalty contracts with corporation by corporation president; *Atkins* v. *Hughes*, 208 Cal. 508 [282 P. 787], involved purchase of unnecessary reservoir site for private use of two directors; *Nixon* v. *Goodwin*, 3 Cal.App. 358 [85 P. 169], involved an unfair transfer of all corporate property to a director president, to defraud existing creditors; *Davis* v. *Rock Creek L. F. & M. Co.*, 55 Cal. 359 [36 Am.Rep. 40], involved the fraudulent purchase of outstanding notes by corporate president on resolution authorizing only borrowing of money.

### ARITHMETICAL ERROR IN JUDGMENT

In paragraph numbered 5 of the judgment appear the figures $19,159. This is based on paragraph 10 of the conclusions of law. It is apparent that the credit of $6,750 found due to appellants in paragraph 21 of findings of fact was

overlooked and not carried forward into the conclusions of law and the judgment. Thus, the figure in paragraph 10 of conclusions of law and paragraph 5 of the judgment should be $12,409. Respondents concede this error.

### CONSIDERATION FOR NOTE

Appellants assert lack of consideration for the note signed by Olive Armstrong Fox and Thomas Fox in the amount of $23,841, dated July 2, 1957, and referred to in the fifth cause of action of Burris' cross-complaint, which, after credits, formed the basis for the judgment shown in paragraph 6 of the judgment against said cross-defendants in the amount of $19,144. Appellants make some point of the finding that the assignment date of the note was April 1, *1957*. It is clear from an examination of the pleadings and the evidence that the true date was April 1, 1959. The cross-complaint shows April 1, 1959, and the evidence (defendant's exhibit "O") likewise shows April 1, 1959. There is no evidence nor pleading to the contrary. However, the exact date is immaterial except as it might create a false illusion that the note was signed prior to the date on which it was made. Actually, both dates were long after Burris ceased to have any control over or relationship with the internal affairs of Corporation. As to consideration, cross-complainants were entitled to rely on the presumption of consideration set up by Civil Code, section 1614. There was no contrary evidence. (*Hamilton* v. *Abadjian,* 30 Cal.2d 49, 52 [3] [179 P.2d 804].)

Our view of the law as hereinbefore set forth, controls all other points raised and makes unnecessary further discussion thereof. Neither do we find it necessary to discuss the additional points of estoppel and laches raised by respondents.

Paragraph 5 of the judgment is modified to strike therefrom the figure $19,159, and there is substituted in place and stead of such stricken amount, the new figure of $12,409.

As so modified, the judgment is affirmed. The parties will bear their own costs on appeal.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied July 28, 1961, and appellants' petition for a hearing by the Supreme Court was denied August 23, 1961.